## SOUTH MEMPHIS LAND CO. v. McLEAN HARDWOOD LUMBER CO.

### (Circuit Court of Appeals, Sixth Circuit.   June 7, 1910.)

**1. CONTRACTS (§ 280\*)—CONSTRUCTION—CONTRACT TO PROVIDE RAILROAD CONNECTIONS TO MANUFACTURING PLANT.**

Plaintiff purchased from defendant land company a site for a large lumber manufacturing plant, but took a contract from defendant, stating that its covenants and undertakings were a part of the consideration for the payment of the purchase price of the site, which recited that "in order to operate said plant certain railroad and transportation facilities * * * are necessary and are guaranteed by the party of the first part (defendant)." Defendant further bound itself, inter alia, that "the Union Railway Company will by * * * erect a spur track from its line on Railroad avenue to the sawmill." The railway company had no line on Railroad avenue, but one was contemplated. *Held*, that the obvious purpose of such provisions was to secure to plaintiff a track connection with the lines of the Union Railway Company, which was a belt line company, and that defendant's guaranty was not conditioned on the building of a line by the railway company on Railroad avenue, nor was it fulfilled by the building of a track from the mill to such avenue without any connection with the lines of the railway company.

[Ed. Note.—For other cases, see Contracts, Dec. Dig. § 280.\*]

**2. CONTRACTS (§ 303\*)—ACTIONS FOR BREACH—DEFENSES—VIS MAJOR.**

That a court had granted a temporary injunction restraining the Union Railway Company from crossing the tracks of another company at grade, which injunction had remained in force for three years without a trial of the case, and because of which the line on Railroad avenue had not been built, did not constitute such vis major as to relieve defendant from liability for nonperformance of its contract; it not appearing that it was impossible to build the line without making such grade crossing.

[Ed. Note.—For other cases, see Contracts, Dec. Dig. § 303.\*]

**3. DAMAGES (§ 120\*)—MEASURE FOR BREACH OF CONTRACT—EVIDENCE.**

Where the vendor of a site for a lumber mill as a part of the consideration for the purchase price contracted to furnish to the plant certain track connections with lines of railroad, the difference between the value of the plant as constructed with and without such connections may fairly be taken as the measure of damages for breach of such contract contemplated by the parties; but the jury should have been instructed, in estimating the present value of the plant, to take into account the contingency of the plaintiff's being able, independently of the defendant's agency, to obtain the track connections.

[Ed. Note.—For other cases, see Damages, Dec. Dig. § 120.\*]

In Error to the Circuit Court of the United States for the Western District of Tennessee.

Action by the McLean Hardwood Lumber Company against the South Memphis Land Company. Judgment for plaintiff, and defendant brings error. Reversed.

The defendant in error brought this suit for the recovery of damages by reason of the failure of the plaintiff in error to perform its agreement to furnish certain switching facilities. Upon a jury trial plaintiff recovered verdict and judgment for $15,000. There were motions for new trial and in arrest of judgment, both of which were overruled. The facts are these:

Before and at the time of the making of the contract in question the defendant was the owner of a large tract of land, for the most part undeveloped, adjoining the city of Memphis, Tenn., which it was desirous of developing, and on which it wished to secure the location of factories and industries gen-

erally. W. A. McLean, an officer of the Hugh McLean Lumber Company, which operated in the state of New York and perhaps elsewhere, went, in the early summer of 1905, to Memphis, and there opened negotiations with defendant respecting the purchase of a site for a large lumber manufacturing plant then in contemplation. The site which was made the subject of negotiation was at this time without any immediate railroad facilities, not being on or connected with a railroad, and thus was unsuited to McLean's requirements, which, as communicated to defendant, included switching facilities to all the railroads in Memphis. The tracks of the Illinois Central Railroad and the Yazoo & Mississippi Valley Railroad (the latter being under Illinois Central management) passed through the defendant's lands. The Illinois Central also operated a belt line for switching cars to its own and other railroads in Memphis. The Union Railway Company, exclusively a belt line, was projecting its road towards defendant's lands. McLean insisted that in the event of his purchase of the site in question he be furnished with both the Illinois Central and the Union Railway Company switching facilities. Defendant negotiated a contract with the Union Railway Company that the latter should construct its main track upon defendant's land, including the locating of the line upon "Railroad Avenue," so-called, and should construct spur tracks from the main line "to any industry that may be located on the said tract of land of (South Memphis) Land Company, upon the request of the land company, provided the business to be obtained by the railway company by the construction of such spur tracks will be sufficient in the opinion of the managing officer of said railway company," and on August 3, 1905, conveyed to McLean the 10-acre site in question upon a consideration of $5,000, of which $500 was paid down, the balance being secured by reservation of vendor's lien. Concurrently with the delivery of this deed, the parties entered into a written agreement whereby, for a consideration of $5 paid by McLean to defendant "and of the consideration paid for" the 10-acre site in question, "the said South Memphis Land Company for itself, its successors and assigns, covenants and agrees with the said William A. McLean, his heirs and assigns, as follows:

"The said Wm. A. McLean expects to convey the said ten acres of land to a corporation known as the Hugh McLean Lumber Company, which will establish a branch in Tennessee after duly complying with Tennessee laws, and said Hugh McLean Lumber Company expects to use said ten acres of land as a site for its sawmill and lumber yards. In order to operate said plant certain railroad and transportation facilities and street improvements are necessary, and are guaranteed by the party of the first part as follows: (1) That the Illinois Central Railroad Company or the Y. & M. V. Railroad Company will, within sixty (60) days from this date construct necessary side track from its main line or from line on Railroad avenue, to the sawmill to be erected by the second party or his assigns. (2) That the Union Railway Company will, by February 1, 1906, erect a spur track from its line on Railroad avenue to the sawmill to be erected by the second party or his assigns. To enter yard of the second party at or near southeast corner of the ten-acre tract, and to continue north to the north boundary of said ten-acre tract. (3) The first party will cause Mallory avenue to be graded and graveled from Florida avenue to the Y. & M. V. Railroad within sixty (60) days from this date.

"The covenants and undertakings of the first party in and by this agreement made and entered into are a part of the consideration moving from the second to the first party, paid upon the execution and delivery of said warranty deed to said ten acres of land, and run with that land to any company hereafter operating a sawmill plant thereon."

Instead of establishing in Tennessee a branch of the Hugh McLean Lumber Company, the plaintiff company was organized November 18, 1905 (which McLean testified "was the Hugh McLean Lumber Company"), to take over the site. The plaintiff company immediately began the erection upon the site of a large lumber manufacturing plant, completed the same (at a cost of about $100,000), and began the operation thereof in the latter part of April or early part of May, 1906; plaintiff's total investment in and connected with the business done at the plant being about $250,000. The date of the conveyance of the site from McLean to the plaintiff is not shown in the record, although the acknowledgment there given bears date of December 17, 1906. The construc-

tion of the Illinois Central (or Yazoo & Mississippi Valley) side track to plaintiff's mill, as well as the grading and graveling of Mallory avenue, were done as provided by the contract. The Union Railway Company constructed its line up to the right of way of the Illinois Central Railroad Company, and was preparing to cross the tracks of that company and enter upon Railroad avenue when, upon bill filed by the latter company in the court below, it was on January 20, 1906, restrained, and on February 6, 1906, temporarily enjoined "from crossing or attempting to cross with railroad tracks the track of complainant with the same grade or level as the tracks of complainant at said point described in the bill until further order of this court." The injunction was never dissolved, and, so far as shown by the record, the injunction suit has not been tried. The crossing has never been made, the tracks of the Union Railway Company have never been built on Railroad avenue, and no switch has been constructed from plaintiff's plant to the tracks of the Union Railway Company. As early as April 3, 1906, plaintiff began complaining of defendant's failure to furnish the agreed switching facilities, and on March 11, 1907, proceedings were threatened unless within 30 days the Union Railway Company's switch should be furnished. Nothing resulting from this threat, this suit was begun May 8, 1907. The trial was begun December 4, 1908. Upon the trial the court construed the contract in suit as obligating defendant to furnish an actual switch connection with the Union Railway Company, holding that the existence of the temporary injunction did not excuse defendant from liability to the plaintiff for failure to furnish the connection; submitted to the jury the question of plaintiff's alleged waiver and defendant's breach, and ruled that the measure of damages was the difference between the respective values of the plant with and without such switching connection. The jury fixed the date of the breach as February 1, 1906.

L. E. Wright, for plaintiff in error.
W. E. Percy, for defendant in error.

Before SEVERENS, WARRINGTON, and KNAPPEN, Circuit Judges.

KNAPPEN, Circuit Judge (after stating the facts as above). The question which first demands attention relates to the construction of the guaranty on which the suit is brought. Defendant contends that its guaranty was only that the Union Railway Company should construct a spur track from plaintiff's mill to a track on Railroad avenue, which the parties then contemplated the railway company would construct; that defendant's undertaking did not extend to a guaranty that the spur track should connect with any track in Railroad avenue; or, in still other words, that the guaranty was conditioned upon the railway company building a track in Railroad avenue. It is apparent that, if this construction is correct, plaintiff should not have been permitted to recover; for there has been no track in Railroad avenue from which a spur could be built, and, moreover, it is clear that plaintiff could not have been damaged by the failure to construct a switch to Railroad avenue unless connection was thereby obtained with the railroad. In our opinion, the construction contended for by defendant cannot be sustained. Such construction does violence, in our judgment, to the express language of the contract, especially in the light of the circumstances under which the guaranty was made. McLean had insisted that in the event of his purchase of the site he be furnished connection with the Union Railway Company. The record leaves no room for doubt that McLean would not have bought

the site but for the expectation and understanding that he was to have the Union Railway Company connection, and that the defendant knew it. The contract in question recites that "in order to operate said plant certain railroad and transportation facilities, and street improvements are necessary, and are guaranteed by the party of the first part." The contract further provides that the covenants and undertakings of the defendant are a part of the consideration for the payment of the purchase price of the site. A track laid from the mill with no connection with the railroad would not furnish a "railroad facility" or a "transportation facility." The guaranty in question is in terms that the railway company will "erect a spur track from its line on Railroad avenue to the sawmill to be erected by the second party or his assigns." To characterize as a "spur track" a track extending from the mill but without other connection would be a solecism in language. The very term "spur track" implies that it extends from another track. Construed as a guaranty that the track in question would connect with a railroad track on Railroad avenue, the contract is entirely reasonable, and in harmony with the intention of the parties as manifested by the surrounding circumstances. A construction that the obligation to build the spur track was conditional upon the railroad being laid in Railroad avenue is, to our minds, unreasonable. The record cannot be read without a clear conviction that if the defendant had proposed in terms to limit its guaranty to the contingency of a track being laid by the railway company in Railroad avenue the purchase would not have been made. The construction adopted by the trial court, and which we approve, is, moreover, in accord with the practical construction placed upon it by the parties.

It is urged by the defendant that the issuing of the injunction forbidding the Union Railway Company to cross the Illinois Central tracks at grade rendered defendant's guaranty impossible of performance, and was thus a complete defense to plaintiff's action. It is also insisted that as the proof showed that the Union Railway Company was seeking to enter upon Railroad avenue, and was ready and willing, on being permitted so to do, to give plaintiff the spur connection guaranteed by defendant, the jury should have been instructed that the failure to furnish the spur was temporary only. This suggestion last referred to is answered by the consideration that while it may be, as contended, that under the law of Tennessee the Union Railway Company had the right to make the desired crossing of the Illinois Central tracks, and that thus the injunction could not be permanently sustained, yet the injunction had existed for nearly three years before the trial, and, so far as the record shows, without the injunction suit having been brought on for hearing; and while the defendant could not control that situation and was not morally responsible for it, yet so far as the plaintiff was concerned it was a fact which it had to meet. Did the issuing and continuance of the injunction constitute such vis major as to amount to impossibility of performance within the law? As said in Dermott v. Jones, 2 Wall. 1, 7 (17 L. Ed. 762):

"It is a well-settled rule of law that if a party by his contract charge himself with an obligation possible to be performed, he must make it good, unless its performance is rendered impossible by the act of God, the law, or the other party. Unforeseen difficulties, however great, will not excuse him"—

and as expressed in The Harriman, 9 Wall., at page 172 (19 L. Ed. 629), quoted in Jacksonville, etc., Ry. Co. v. Hooper, 160 U. S. at page 527, 16 Sup. Ct., page 384 (40 L. Ed. 515):

"The principle deducible from the authorities is that, if what is agreed to be done is possible and lawful, it must be done. Difficulty or improbability of accomplishing the undertaking will not avail the defendant. It must be shown that the thing cannot by any means be effected. Nothing short of this will excuse nonperformance. The answer to the objection of hardship in all such cases is that it might have been guarded against by a proper stipulation. It is the province of courts to enforce contracts—not to make or modify them. When there is neither fraud, accident, nor mistake, the exercise of dispensing power is not a judicial function."

See, also, Northern Pacific Ry. Co. v. American Trading Co., 195 U. S. 439, 466, 25 Sup. Ct. 84, 49 L. Ed. 269; Lima Locomotive & Mach. Co. v. National Steel Castings Co. (C. C. A., 6th Circuit) 155 Fed. 77, 83 C. C. A. 593, 11 L. R. A. (N. S.) 713.

It is clear that, unless the issuing of the injunction is to be regarded as an act of the law, the injunction, even if an absolute prohibition against the crossing of the Illinois Central tracks, would not excuse the breach of the guaranty. There is no doubt that a legal impossibility arising from a change in the law of the country exonerates the promisor. Clark on Contracts, p. 681; Dermott v. Jones, supra. There is highly respectable authority for the proposition that judicial process, order, or decree may constitute such vis major as to relieve a party from an otherwise absolute obligation. Bishop on Contracts, § 607; People v. Globe Mutual Life Ins. Co., 91 N. Y. 174; Malcomson v. Wappoo Mills (C. C.) 88 Fed. 680; Kansas Union Life Ins. Co. v. Burman (C. C. A., 8th Circuit), 141 Fed. 835, 73 C. C. A. 69; Burkhardt v. Georgia School Tp., 9 S. D. 315, 69 N. W. 16. On the other hand, there is excellent authority for the proposition that an injunction in a suit by a third party furnishes no excuse for nonperformance of an express contract. Page on Contracts, § 1734; Union Co. v. Campbell, 2 Cal. App. 535, 84 Pac. 305; Wilkinson v. First National Fire Ins. Co., 72 N. Y. 499, 28 Am. Rep. 166; Spader v. Mural Decoration Manf'g Co., 47 N. J. Eq. 18, 20 Atl. 378. In the view we take of the case, we do not find it necessary to determine what the effect of the injunction would have been had it absolutely forbidden the entering of the Union Railway line upon Railroad avenue. The injunction did not have that effect. At the most it forbade the Union Railway Company crossing the Illinois Central tracks at grade. It did not forbid entering upon Railroad avenue in any other manner. The defendant did not definitely offer to show that it was impossible for the Union Railway Company to reach Railroad avenue, and thus to make connection with plaintiff's plant, otherwise than by crossing the Illinois Central tracks at grade. The offered testimony (so far as material here) was merely that if "he (the witness) would put a crossing there underneath—an under

crossing, or a subway crossing—that it would prevent the surveys (service?) to many of the factories which are there in South Memphis, and which this company (the Union Railway) would like to reach." This amounts, at most, to a proposition that the crossing of the tracks otherwise than at grade would be difficult and expensive, as well as unsatisfactory and undesirable to the railway company. But difficulty or expensiveness of. construction is not a defense to an action for breach of a positive guaranty. Passing, therefore, the question of whether the defendant should not be held, in view of the express nature of its guaranty (in connection with the provision in its contract with the Union Railway Company relative to injunction) to have contemplated the possibility of injunction, and to have intentionally guaranteed against it, we have no hesitancy in holding that the injunction as issued did not constitute a legal defense to plaintiff's action.

The defendant's final contention is that the measure of damages adopted by the trial court, viz., the difference between the respective values of the plant with and without the guaranteed connection, is erroneous, in that such damages are remote, uncertain and speculative, and cannot fairly be said to have been within the contemplation of the parties. Defendant insists that, at the most, plaintiff can recover only what it would have cost it to build the spur track. If we have rightly construed the guaranty as requiring connection with a railroad in Railroad avenue, manifestly the measure of damages suggested by defendant is not the proper one. In our opinion the criticism that the damages permitted to be recovered, viz., the lessened value of the plant through the loss of the railway connection, cannot fairly be said to have been within the contemplation of the parties to the guaranty, as likely to result from its breach, is not justified under the facts presented. The guaranty was of a facility deemed by the parties necessary to the beneficial operation of the plant. The site was bought and sold for the express purpose of the operation of such plant. The guaranty was expressly stated to be a part of the consideration for the purchase. The lessened value of the plant may thus well be held to have been within the contemplation of the parties as the damage likely to result directly from a breach of the guaranty, In this connection, specific complaint is made that the court admitted evidence that the lumber company had purchased large quantities of logs along the line of the Yazoo & Mississippi Valley Railroad Company, and which logs were either badly damaged or became a total loss by reason of the inability of the lumber company to get cars. It is urged that the connection with the Union Railway Company could not have facilitated the handling of the logs in question. There was testimony that at times plaintiff was unable to get loaded cars in the Illinois Central yards delivered to its plant because of inadequate switching service on the part of the Illinois Central; also, that in times of car shortage other roads were loth to furnish cars because of fear that they would be kept by the Illinois Central. We cannot say that this condition may not have interfered with plain-

tiff's ability to get cars to promptly bring in the logs.   Moreover, this testimony was admitted not as the basis for a recovery of specific damages for this special alleged loss, but by way of actual experience as bearing upon the subject of the lessened value of the plant.   Was the testimony of such lessened value speculative?   The evidence most relied upon by the plaintiff as to the value of the plant with the railroad connection in question, and with which the value without the connection was compared for the purpose of ascertaining the resulting damage, was that the plant would be fully worth, with the connection, all it cost.   Testimony of this nature does not impress us as necessarily speculative when applied to a lumber manufacturing plant adjacent to a prosperous city, having good railway connections, and with a large and heavily timbered territory tributary to it.   At the time of the trial the plant had been in operation for nearly three years without the railway connection in question.   Its value, shown by actual use during that period, was not more highly speculative than testimony usually given of the value of real estate.   An important question in this connection is whether there was testimony fairly tending to attribute the lessened value to the lack of the railroad facility.   There was testimony tending to show that during nearly three seasons of operation there had been insufficient railroad facilities, resulting in an inability to get logs, through failure in many cases to get switching promptly done, and that thus logs spoiled in the woods; that plaintiff had to stop buying logs; that the mill was thus not only unable to run full hours, but at times was compelled to shut down entirely.   There was testimony tending to show that these conditions were traceable, to a greater or less extent, to the lack of the Union Railway connection, and especially to the lack of competition with the Illinois Central Railroad.   While it could not be demonstrated, with mathematical certainty, that the conditions referred to resulted from the lack of the Union Railway connection, we cannot say that the testimony did not furnish a reasonable basis for determining the injury resulting from the lack of that connection.   See 4 Elliott on Railroads, § 1799; Montana Ry. Co. v. Warren, 137 U. S. 352, 11 Sup. Ct. 96, 34 L. Ed. 681.   The following cases are authority for the proposition that the measure of damages for failure to contruct a depot or other railroad facility is the difference between what the real estate to which the facility was to have been given would be worth had the facility been furnished and its value without such facility.   Watterson v. Alleghany Valley R. R. Co., 74 Pa. 208; Mobile & Montgomery Ry. Co. v. Gilmer, 85 Ala. 422, 5 South. 138; Blagen v. Thompson, 23 Or. 239, 31 Pac. 647, 18 L. R. A. 315; Belt v. Washington Water Power Co., 24 Wash. 387, 64 Pac. 525; Houston & Texas Central Ry. Co. v. Molloy, 64 Tex. 607.

It is, however, insisted by defendant that the case of Eckington, etc., Ry. Co. v. McDevitt, 191 U. S. 103, 24 Sup. Ct. 36, 48 L. Ed. 112, is expressly opposed to the rule of damages adopted in this case.   In the McDevitt Case plaintiff had conveyed to the street railway company a right of way across her land and had agreed to pay

a certain sum of money, in consideration of which the railway company had agreed to extend its road over the right of way granted, and that after such extension should be completed and open for traffic, cars should be run at stated intervals and during certain hours, but without provision for such operation during any designated period. The extension was made and operated for several years, when it was abandoned because not profitable, and on account of doubts as to the right to so operate without congressional authority. The plaintiff's demand that the railway company take up its tracks and restore possession of the right of way was complied with, and plaintiff was relieved from paying the money consideration provided for. The trial court instructed the jury that the measure of damages was the excess, if any, in the market value of the land at the time the railway company entirely ceased to run its cars, with the cars running in accordance with the terms of the contract, and the expectation of their continuing to so run in the future, over the market value of the same land at the same time without any cars running on the same, and without any expectation that they would ever run thereon. As said by Chief Justice Fuller:

"The instruction was addressed to differences in market value as affected by the running of the cars, with the element added of expectation of continuance or cessation for all time. As thus put the supposed difference in market values amounted to anticipated profits, and thus were not recoverable if dependent on uncertain and changing contingencies, and not in the contemplation of both parties as a probable consequence of the breach. Howard v. Stillwell & Bierce Manf'g Co., 139 U. S. 199 [11 Sup. Ct. 500, 35 L. Ed. 147]; Globe Refining Co. v. Landa Cotton Co., 190 U. S. 540 [23 Sup. Ct. 754, 47 L. Ed. 1171]."

And again, with reference to the claim of right of recovery upon the basis of future values, Justice Fuller said:

"What might have been made by selling the land at a value enhanced by the operation of the tracks in perpetuity was purely problematical, and not naturally in contemplation. And the more so in view of the fact that railroad companies, while private corporations, are quasi public, engaged in the performance of public duties, and that contracts which prevent them from the discharge of those duties cannot be sustained. It did not follow that the company, because it possessed the power to construct and operate this extension, could contract to operate it forever in so absolute a sense that damages could be awarded for the breach of such a contract predicated on the expectation of its perpetual operation. Texas & Pacific Railway Co. v. Marshall, 136 U. S. 393 [10 Sup. Ct. 846, 34 L. Ed. 385]."

Several cases are cited in the opinion in the McDevitt Case as illustrative of the uncertainties which may defeat recovery of anticipated profits. Neither the McDevitt Case, nor any of the cases cited therein, contains the element found here, viz., a damage to the real estate with respect to the very use and purpose for which it was sold, and for the direct and immediate benefit of which, as respects such use, the guaranty was made. Moreover, the damages sought here are rather in the nature of losses incurred than of gains prevented. As applied to the facts of this case, we think that, generally stated, the measure of plaintiff's damage was the difference between the respective values of the plant with and without the guaranteed connec-

tion. It follows from what we have said that the court did not err in refusing to direct a verdict for defendant.

It is clear, however, upon the authority of the McDevitt Case, that if in this case the jury were instructed expressly or by fair implication that they should assess plaintiff's damages upon the assumption that plaintiff would never get the Union Railway connection the judgment must be reversed. The language used by the court was that "the measure of damages, if any, is the difference between the market value of the plant of the plaintiff, in its condition at the date of the breach of the contract, and what its market value would have been at the same date if the switching connection guaranteed by the defendant had been furnished"; and again, "What was the market value at that time, situated as it was? What does the proof show its market value would have been at that time if the connecting had been made?" Following this query, the court said:

"How are you to arrive at that? Testimony has been introduced in which witnesses state that the property situated as it was and is would have been and is worth fifty thousand dollars; with the connection that was contracted for under this agreement it would have been worth one hundred thousand dollars. Some said it was worth seventy-five and some said one hundred thousand dollars as it is, and much more, 30 per cent more if it had the connection. You will remember how these facts are. But that is the opinion of these witnesses, and it goes to you as circumstances, together with all the other proof, to enable you to determine for yourselves, under all the proof, what the damage is, if any, to that property, and the jury will, for themselves, determine, from the proof, together with the opinions of these witnesses, what the damage was, if any."

Did this instruction, either expressly or by fair implication, direct the jury to assume, in measuring the plaintiff's damages, that the plant would never obtain the switching connection in question? Considering the instruction in connection with the plaintiff's testimony as to the amount and nature of the damages claimed to have been suffered, and with what occurred in connection with the reception of such testimony, and in view of the fact that the instruction in question was nowhere qualified, we think the jury might naturally infer that the present value of the plant should be determined on the basis that the plaintiff would never get the Union Railway connection. To the proffered testimony of the respective values of the plant with and without the belt line facility, the defendant objected that such difference was not the measure of the plaintiff's damage, urging in support of such objection that plaintiff was endeavoring to show damages for all time; that, however, if the injunction should be dissolved there was reasonable expectation that the switching facility in question would be promptly furnished; and that the value of the plant thereafter would not be affected by the previous lack of this facility. The trial judge does not seem at this time to have finally determined what measure of damages would be ultimately adopted. The objection referred to was overruled, with the statement that the testimony might be later withdrawn from the jury. Later, a witness as to the lessened value of the plant through the lack of the switching connection stated, in answer to a question by the court, that if the

Union Railway should soon build the connection that would restore the value of the property "from the present time on"; and that "if we had it there to-day, it would be the same as if it was put in there some time ago, barring the inconvenience." Still later, the court, in admitting testimony of the rental value of the plant with and without the guaranteed connection, told the jury that the testimony was admitted not to fix the amount of damages, but to enable them to determine "the value of the property as it is and the value as it would be if it had this connection"; again propounding to the witness the question—"What would be the reasonably fair valuation of the property if it had this additional connection as provided for in the contract?" To this question the witness answered that with the switching connection in question the plant would be worth $100,000, that he "would be willing to take $50,000 for it to-day," stating on further cross-examination, "If I thought we couldn't get that switch in there finally, I would take $40,000 for it." We do not think it was the duty of the court to instruct the jury to take into account the contingency of defendant's ultimate compliance with its guaranty, for the reason that the plaintiff was suing for, and was allowed to recover, damages once for all, and the judgment would thus effectually relieve defendant from further liability under its guaranty. But in view of the state of the record to which we have called attention, it was, in our opinion, the duty of the court to instruct the jury to take into account the contingency of the plaintiff's being able, independently of the defendant's agency, to obtain the desired connection; and in view of what had taken place upon the trial, the jury may well have been misled by the charge of the court into an understanding that they were to take into account the value of the plant as perpetually deprived of the Union Railway facility. This consideration constrains us to a reversal of the judgment.

We have considered the remaining assignments presented, but, in view of the conclusions we have reached, do not find it necessary to discuss them, beyond saying that we discover no error in the record except, as above pointed out, in the charge upon the measure of damages. For this error, the judgment must be reversed, and a new trial ordered.