### No. 22,307.

THE WESTERN DRUG SUPPLY & SPECIALTY COMPANY (for the use of Louis Lowenstein), *Plaintiff*, v. THE BOARD OF ADMINISTRATION OF THE STATE OF KANSAS, *et al., Defendant.*

#### SYLLABUS BY THE COURT.

1. CONTRACT—*To Furnish Supplies for State Institution—Plaintiff's Assets Taken and Sold by Receiver—No Excuse for Nonperformance of Contract.* The plaintiff, a drug company, contracted to furnish the board of administration certain supplies for the state institutions. After complying with the contract for a while it ceased to furnish goods for the reason that a creditor had sued and procured the appointment of a receiver who took over and sold all of the plaintiff's assets. *Held*, not a defence to an action or claim of offset for damages for breach of the contract.

2. SAME. Generally, when one contracts to do a thing possible in itself he will be liable for breach of such contract, notwithstanding the occurrence of a contingency which, although not foreseen by him or within his control, but which might have been provided against, has put it out of his power to perform.

Original proceeding in mandamus. Opinion filed February 7, 1920. Writ denied.

*Charles S. Briggs,* of Topeka, and *E. J. Geittman,* of Kansas City, Mo., for the plaintiff.

*Richard J. Hopkins,* attorney-general, and *S. N. Hawkes,* assistant attorney-general, for the defendant.

The opinion of the court was delivered by

WEST, J.: This action involves the one question, the right of the plaintiff to compel the defendant to issue a voucher for the amount claimed to be due. By the agreed statement of facts it appears that, in the fall of 1917, the board contracted in writing with the plaintiff for certain supplies for the state institutions, and the plaintiff made a bond to faithfully perform its obligations. The supplies were furnished until January 24, 1918, since which time no more have been furnished, for the sole reason that an action was filed against the plaintiff in Jackson county, Missouri, and a receiver appointed for all its effects, who also took charge of all its assets and sold them in bulk to Louis Lowenstein, for whose benefit this action is brought. The damages suffered by the defendant on account of the failure to supply the goods amount to the precise sum claimed to be due by the plaintiff.

The plaintiff invokes the doctrine of *vis major,* and contends that as its failure was no fault of its own, but was caused by the receivership, it should be unburdened with any liability therefor. The cases of *Malcomson v. Wappoo Mills,* 88 Fed. 680; *Kansas Union Life Ins. Co. v. Burman,* 141 Fed. 835; *In re Inman & Co.,* 171 Fed. 185; *In re Inman & Co.,* 175 Fed. 312; and *South Memphis Land Co. v. M'Lean Hardwood L. Co.,* 179 Fed. 417, 421, are cited.

The defendant asserts that, having contracted to furnish the goods, the plaintiff is not absolved from liability for failure on account of the receivership, and cites as authorities *Roehm. v. Horst,* 178 U. S. 1, and *Central Trust Co. v. Chicago Auditorium,* 240 U. S. 581. The Malcomson case is not applicable. *Kansas Union Life Ins. Co. v. Burman,* was decided by the eighth circuit court of appeals, which held that when one insurance company took over the business and policies of another, and the agent of the transferring company took service under the transferee, which agreed to guarantee his commis-

sions on renewal premiums as paid to the company, but before any such premiums were collected, by a decree of the court at the suit of stockholders, the transfer agreement was declared to be *ultra vires*, the superior force which prevented performance was in such case the interposition of the court which rendered the performance impossible. The company guaranteed the performance of the contract for such commissions, which contract provided that in case the employment should end for any cause the company would pay the commission on renewal policies as they were paid to the company. It was held that the agent could not recover against the transferee for the value of such renewals on the ground that the defendant company had wrongfully rendered the contract impossible of performance. It was said that the contract between the two companies was in existence forty days before the plaintiff's contract was entered into, and that he knew about the former when he made the latter, and that the former was being tested in court.

"In principle there can be no distinction between an injunction granted on the interposition of the state in the exercise of the soverign right of visitation, and one granted by the court at the suit of a stockholder on the ground that the transaction of the two corporations is in contravention of the charter granted by the sovereign. The decree of the court rendered it illegal for the plaintiff in error to collect or receive a dollar of premiums on the policies issued by the Mutual Company; and it. prevented the agent from paying over a dollar to the plaintiff in error of any such premiums. . . . The *vis major*, which prevents performance in such cases, is the interposition of the court. . . . The substantive thing contracted about by the parties here was the collection of renewal premiums on the policies theretofore issued by the Mutual Company, on which depended the right of the defendant in error to commissions. And when the court, without default on the part of either party, and against the resistance of the plaintiff in error, impounded the subject-matter—took it into *custodia legis*—and prohibited the plaintiff in error from collecting or receiving any such premiums, and required the agent to attorn to the trustees appointed by the court, it in effect put an end to the existence of the thing—the subject of the contract—in so far as the parties to that contract were concerned." (p. 848.)

It will readily be seen that the circumstances were quite different from those now under consideration, and that the very basis on which that action was brought was declared void. In *South Memphis Land Co. v. M'Lean Hardwood L. Co.*, 179 Fed. 417, the sixth circuit court of appeals had under con-

Drug Supply Co. v. Board of Administration.

sideration a contract by which a lumber company purchased a site for a plant from a land company. which guaranteed certain railroad facilities and bound itself to see that a railroad company should erect a spur track on Railroad avenue to the plaintiff's sawmill. The railroad company had no line on Railroad avenue, but one was contemplated. An injunction was granted restraining this company from crossing the tracks of another railroad company at grade, which injunction had remained in force for three years without a trial of the case, and for this reason the line on Railroad avenue was not built, and this was held not to relieve the defendant of liability for nonperformance of its contract. The court quoted from *Dermott v. Jones,* 2 Wall. 1, 7, the rule there announced that, "If a party by his contract charge himself with an obligation possible to be performed, he must make it good, unless its performance is rendered impossible by the act of God, the law, or the other party. Unforeseen difficulties, however great, will not excuse him." (p. 421.)

It was said:

"It is clear that unless the issuing of the injunction is to be regarded as an act of the law, the injunction, even if an absolute prohibition against the crossing of the Illinois Central tracks, would not excuse the breach of the guaranty. There is no doubt that a legal impossibility arising from a change in the law of the country exonerates the promisor. . . . There is highly respectable authority for the proposition that judicial process, order, or decree may constitute such *vis major* as to relieve a party from an otherwise absolute obligation. . . . On the other hand, there is excellent authority for the proposition that an injunction in a suit by a third party furnishes no excuse for nonperformance of an express contract." (*South Memphis Land Co. v. M'Lean Hardware L. Co.,* 179 Fed. 417, 421.)

In the Inman case (171 Fed. 185), it was held by the United States district court for the northern district of Georgia that an adjudication in involuntary bankruptcy terminates a contract of employment, and that the employee has no claim for damages for breach of the contract provable against the estate in bankruptcy. After a review of many authorities the conclusion was reached that the adjudication of bankruptcy terminated the contract of employment by operation of law, and ended all liabilities except such as were expressed in the bankruptcy act. In the Inman case, decided by the same court, 175 Fed. 312, the decision just referred to was fol-

lowed. The judge said he did not believe that where involuntary proceedings in bankruptcy are instituted, and the bankrupt's business and effects are taken charge of by the court, and administered for the benefit of the creditors, it constitutes such a breach of an executory contract as to authorize proof in bankruptcy for the amount of damages claimed to have been caused by the failure to carry out the contract. *Roehm v. Horst*, 178 U. S. 1, involved only the refusal of an executory contract, and, hence, is not applicable. *Central Trust Co. v. Chicago Auditorium*, 240 U. S. 581, decided that the intervention of bankruptcy, under the circumstances shown, constituted a breach of contract, notwithstanding the petition was involuntary, and it was held that the claim of the promisee was one founded upon a contract expressed or implied and provable under the bankruptcy act. A transfer company contracted with a hotel company for certain baggage and livery privileges for five years. The hotel company reserved the right to cancel by giving six months' notice on certain specified conditions. It also reserved the right to terminate the privileges at its option if the transfer company defaulted for thirty days in the payment of any installment due. The contract remained in force until the transfer company was adjudged a bankrupt, neither party having failed in its performance. The hotel company entered into an agreement with other parties for the performance of baggage and livery services, and exhibited against the estate a claim for unliquidated damages for failure of the bankrupt to carry out its contract. The trustee objected to this claim, and the referee sustained him. This was affirmed by the district court and reversed by the circuit court of appeals with direction to allow the claim. The supreme court said:

"Whether the intervention of bankruptcy constitutes such a breach and gives rise to a claim provable in the bankruptcy proceedings is a question not covered by any previous decision of this court, and upon which the other Federal courts are in conflict. . . . It is argued that there can be no anticipatory breach of contract except it result from the voluntary act of one of the parties, and that the filing of an involuntary petition in bankruptcy, with adjudication thereon, is but the act of the law resulting from an adverse proceeding instituted by creditors. . . . Executory agreements play so important a part in the commercial world that it would lead to most unfortunate results if, by interpreting the (bankruptcy) Act in a narrow sense, persons entitled to performance of

such agreements on the part of bankrupts were excluded from participation in bankrupt estates, while the bankrupts themselves, as a necessary corollary, were left still subject to action for nonperformance in the future, although without the property or credit often necessary to enable them to perform. We conclude that proceedings, whether voluntary or involuntary, resulting in an adjudication of bankruptcy, are the equivalent of an anticipatory breach of an executory agreement, within the doctrine of *Roehm v. Horst, supra* . . . We therefore conclude that the Circuit Court of Appeals was correct in holding that the intervention of bankruptcy constituted such a breach of the contract in question as entitled the Auditorium Asociation to prove its claim." (pp. 589, 590, 591, 593.)

It will be observed that none of these cases relied on precisely fits the case we are considering. This was not a suit in a federal court and did not involve the bankruptcy act. We must, therefore, find a solution of the question presented by going back to chart-class rules long ago announced and ever since followed. One would suppose that if he enters into a contract to do a thing which he knows may become impossible, he should be bound thereby, for otherwise to sign such a contract would be an idle thing, and any probable or foreseen contingency could be guarded against "while yet it is day." And the law, which is said to be common sense, also reasons on this wise. Chitty on Contracts, 15th ed., uses these words:

"As a general proposition of law, if a man contract to do a thing which is absolutely impossible, such contract will not bind him, because no man can be obliged to perform an impossibility. . . . But where the contract is to do a thing which is possible in itself; or where it is conditioned on an event which happens; the promisor will be liable for a breach thereof, notwithstanding that the occurrence of an accident, or other contingency which, although it was not foreseen by, or within the control of the party, might have been provided against by his contract, has put it beyond his power to perform it." (pp. 707, 708.)

The authority regarded by many as almost the father of the law of contracts—Parsons—says:

"It has been somewhat questioned, how far the impossibility of doing what a contract requires, is a good defence against an action for the breach of it. If the performance of a contract becomes impossible by the act of God, that is, by a cause which could not possibly be attributed to the promisor, and this impossibility was not among the probable contingencies which a prudent man should have foreseen and provided for, it should seem that this would be a sufficient defence. But to make the act of God a defence, it must amount to an impossibility

of performance by the promisor; mere hardship or difficulty will not suffice. . . . So if it becomes impossible by contingencies which should have been foreseen and provided against in the contract, and still more if they might have been prevented, the promisor should be held answerable." (2 Parsons on Contracts, 9th ed. [*672, 673] 823, 825.)

In *Nugent v. Smith,* 1 C. P. Div. 423, a common carrier by sea from London to Aberdeen, received from the plaintiff a mare to be carried to Aberdeen for hire. In the course of the voyage the ship encountered rough weather, and the mare received such injuries that she died. This was held to be an irresistible act of nature which relieved the carrier from performance of his contract, it being held that the loss could not have been prevented. Chief Justice Cockburn, in the opinion, said that the language of the Praetorian Edict, as given in the Digest, might be construed to mean that the liability of the carrier by sea was unlimited, but that Ulpian construed it to mean that the absence of blame relieved the carrier.

"There is no doubt that inevitable accident . . . exempts the carrier from liability. . . . Such is the Roman law, and such is the existing law of all the nations which have adopted the Roman law— France, Spain, Italy, Germany, Holland, and, to come nearer home, Scotland. It is embodied in the Code Civil of France." (p. 429.)

In *Brousseau v. Ship Hudson,* 11 La. Ann. 427, the plaintiff sought to recover for the loss of four bales of carpeting shipped to New York by sea and damaged by the bursting of four casks of chloride of lime in the hold of the vessel. It was testified that the importation of chloride of lime had been carried on for twenty years without any bursting of the casks. It was held that, under the Louisiana code, which makes the carrier liable unless the loss was by accidental or uncontrollable events, the defendant was liable, the principle of superior force not being applicable. In *Romero & Bayard v. Newman,* 50 La. Ann. 80, a planter contracted with the owner of a refinery to grind for a number of years the cane on his plantation, at his own sugar house, and there convert it into syrup and then convey it to the refinery through pipes laid down at its own expense. During the second year of the contract a fire destroyed the planter's sugar house, placing it out of the owner's power to comply further with his obli-

Drug Supply Co. v. Board of Administration.

gations. The contract contained a clause that the planter should, at the end of the contract, purchase the pipes at their value. It was held that the refinery owner thus in assuming the deterioration of the pipes during the contract did so in view of continuing benefits to result to him therefrom, and being deprived thereof by fire he should have the highest estimated value placed upon the pipes. It was said that when the refinery people contracted it was evidently in view of the fact that in the interval between the formation of the contract and its ending they would have drawn certain benefits. "Of this use they have been deprived by a fire for which they were not responsible." (p. 92.) The decision seems to rest somewhat on the provisions of the Louisiana code. The Michigan supreme court, in *Switzer v. Pinconning Mfg. Co.*, 59 Mich. 488, held that when no express or implied provision as to impossibility of performance can be found in the terms or circumstances of a contract, the promisor generally remains responsible for damages notwithstanding a supervening impossibility.

It appears, therefore, both by reason and by authority, that the party contracting to furnish goods for a certain length of time, and making such contract doubly sure by giving bond for its performance, cannot be relieved because some one brought a lawsuit and by receivership impounded and sold its assets. This might have reasonably been foreseen and guarded against, and having taken its chances the drug company, and the purchaser at the bankrupt sale, must abide by the consequences.

The writ is denied.