No. 39,798

Maurice S. Bailey and Marion G. Bailey, Husband and Wife, *Appellants*, v. A. L. Talbert and The First National Bank of Neodesha, a corporation, *Appellees*.

(294 P. 2d 220)

Opinion filed February 29, 1956.

L. J. Bond, of El Dorado, argued the cause, and Robert M. Bond, of El Dorado, and D. H. Forbes, of Neodesha, were with him on the briefs for the appellants.

T. D. Hampson, of Fredonia, argued the cause, and P. W. Stephens, of Neodesha, was with him on the briefs for the appellee.

The opinion of the court was delivered by

ROBB, J.: This was an appeal from a judgment of the trial court in favor of defendants. Plaintiffs brought the original action for cancellation of a contract of purchase. The trial court allowed reformation of the contract and entered judgment in favor of defendants for specific performance of the reformed contract by plaintiffs.

The First National Bank of Neodesha, one of the defendants, was only the escrow holder. Plaintiffs agree there was no issue between the bank and any of the parties and for clarity in this opinion we will hereafter refer to A. L. Talbert, the other defendant, as the appellee, and to the Baileys as the appellants.

Appellants and appellee were long time residents of Neodesha; appellants were a young couple who had had an oil and gas station after Maurice Bailey's graduation from college; since 1939 appellee, who was an elderly man, had operated a bottling plant in Neodesha during which time he had had the Pepsi Cola franchise in the district around Neodesha; for a number of years appellants had shown an interest in appellee's bottling plant, and in 1951 they entered into a preliminary contract with appellee dated June 20, 1951, to purchase appellee's plant for the price of $100,000; the provisions of this contract need not be set out in full, but it is necessary to include the following:

"Parties of the second part will pay this day to the escrow agent the sum of Ten Thousand Dollars ($10,000.00), said sum of money to be held by the escrow agent pending the completion of agreements necessary to consummate the foregoing transaction."

A second provision necessary to a full understanding of the agreement is as follows:

"It is agreed by and between the parties hereto that said sale of personal property is subject to party of the first part receiving permission to transfer the Neodesha Pepsi Cola Bottling franchise, Mission Orange franchise, Dr. Sweet's Root Beer franchise, to parties of the second part."

Other pertinent provisions of the contract are:

". . . it being the expressed intention of the parties hereto to complete said agreement by July 1, 1951, however, it is mutually agreed by and between the parties hereto that in event consent to transfer said franchises are not received within said time, that additional reasonable time will be granted to the parties hereto to comply with all the terms of any agreements to be executed . . .

". . . if party of the first part receives permission to transfer said franchises and makes and executes all papers required hereunder, should parties of the second part fail or refuse to sign said papers, then the escrow agent is authorized and directed by parties of the second part upon demand of party of the first part, to pay party of the first part the sum of Ten Thousand Dollars ($10,000.00) heretofore mentioned and placed in the hands of the escrow agent; said sum to be treated as liquidated damages sustained by party of the first part. Parties of the second part to reassign all franchises."

A memorandum was signed by the parties which amended the agreement as follows:

"It is agreed that in the event party of the first part cannot secure the transfer of the Pepsi Cola Franchise, that the escrow agent is to return to parties of the second part the Ten Thousand Dollars ($10,000.00) this day placed in the hands of the escrow agent."

It was evident from the record that the contract of June 20, 1951 was a preliminary agreement and was to be supplemented by a later contract. The record reflects many facts and circumstances which transpired between June 20, 1951, the time of the execution of the first agreement, and June 30, 1951, the time of the execution of the second agreement, but no purpose will be served by setting them out here. It was mutually admitted and testified to by all parties that the plant was of no value without the Pepsi Cola franchise covering the counties of the district around Neodesha. The second and final agreement contained much of the same language as the preliminary agreement. The purchase price was again set at $100,000. The following parts of the second agreement are of particular concern here:

"Said consideration [$100,000] to be paid in the following manner, to wit: Parties of the second part will pay this day to party of the first part . . . $25,000.00 . . .

"It is agreed by and between the parties hereto that said sale . . . is subject to party of the first part *receiving permission* to transfer the Pepsi Cola

Bottling Company franchise to parties of the second part. It is further agreed that in the event *permission to transfer* said franchise to parties of the second part cannot be procured, party of the first part will immediately return to parties of the second part the sum of twenty-five thousand Dollars ($25,000.00) and parties of the second part will redeliver to party of the first part the Pepsi Cola Bottling Company of Neodesha . . . and will make and execute all necessary instruments to put the parties in the same position they were prior to the execution of this agreement and the preliminary agreement date—June 20, 1951." (Our italics.)

At all times pertinent to the execution of the entire transaction both parties had present and were represented by counsel.

Many additional facts and incidents which took place after the execution of the final agreement were shown by the record, but the one of primary and controlling interest was that the Pepsi Cola franchise was never transferred to appellants and it finally became apparent that it never would be. On or about June 30, 1952, appellants closed the plant and filed suit to cancel and rescind the contracts and for other relief.

This action proceeded to trial and an abundance of evidence and testimony was introduced. Appellee demurred to appellants' evidence, which demurrer was argued to the trial court and overruled. It is not necessary for disposition of this appeal to set out all the pleadings, all the evidence, and the stipulations of counsel. The same is true of the findings of fact except for the following:

"6.

"Said plaintiffs and defendant were advised and informed by Mr. Eugene Gilbert of the things that would be necessary to be done and performed by each of the respective parties in order for said plaintiffs to secure the franchise from the Pepsi Cola Company.

"7.

"In compliance with said requirements of said Pepsi Cola Company of New York, plaintiffs executed and delivered to the Pepsi Cola Company an instrument designated by the parties as 'Letter of Intention', which was introduced and accepted in evidence as Plaintiffs' Exhibit C.

"8.

"The plaintiffs and defendant were informed by Eugene Gilbert that the defendant could not transfer his franchise but that his franchise would have to be surrendered to the company and a new franchise issued to the plaintiffs if the plaintiffs were acceptable to said Pepsi Cola Company of New York; the plaintiffs and defendant at the time of the execution of Exhibit C were advised and informed as to the necessary steps to be taken and the necessary things to be performed upon the part of each of said parties plaintiff and defendant, which was agreed to by said plaintiffs and defendant.

"9.

"Thereafter, and on June 30, 1951, said parties after being definitely advised and informed, entered into a supplemental agreement, which said supplemental agreement so executed by said parties was introduced and accepted in evidence and marked as Plaintiffs' Exhibit B. Said agreement failed to set out the full intentions and agreements of the parties to said agreement in that said parties knew at the time of the execution of said agreement that the defendant could not transfer the franchise to the plaintiffs as defendant's franchise had to be surrendered to the company and a new franchise issued to the plaintiffs, and said agreement specifically did not provide for delivery of possession and operation of said business as of the date of July 1st or 2nd, 1951."

Only the first conclusion of law is pertinent:

"The Agreements entered into by and between the plaintiffs, Maurice S. Bailey and Marion G. Bailey, and the defendant A. L. Talbert, set out as Plaintiffs' Exhibits A and B, should be reformed to show the intention and agreement of the parties as entered into as set out in the Findings of Fact."

The necessary part of the trial court's journal entry of judgment touching on the proposition here under consideration was:

"That the contracts, set out as plaintiffs' Exhibits 'A' and 'B', be and the same are hereby reformed and corrected according to the real intent of the parties as set out in the Findings of Fact."

There were eight specifications of error, but we are concerned with only the one to the effect that the court erred in its findings of fact and conclusions of law.

It is suffice to say the record was completely silent as to any evidence showing mistake, lack of understanding or knowledge on the part of the appellee as to the provisions of the contracts in case there was failure on the part of appellee to effect a transfer of his Pepsi Cola franchise to appellants. The other findings of fact of the trial court summarily showed all conditions, circumstances and requirements surrounding that provision of the contracts were well known to all parties, the parties were well represented by counsel, and the contracts were entered into.

The findings of fact set out herein were based on facts and circumstances which were learned and which took place between the contract of June 20, 1951, and the contract of June 30, 1951. It is well to note that the memorandum appended to the contract of June 20, 1951, was in substance incorporated into the contract of June 30, 1951, so it cannot be said that the parties intended to leave it out. An additional indication of this intention was shown

when the amount of $10,000 cash in escrow in the contract of June 20, 1951, was changed to the amount of $25,000 cash to be placed in escrow according to the contract of June 30, 1951. The trial court reformed the contract of June 30, 1951, in keeping with the facts and circumstances developed in the interim between the two contracts.

In *Lawrence v. Cooper Independent Theatres*, 177 Kan. 125, 276 P. 2d 350, in discussing the interpretation of a lease contract, this court stated that oral testimony concerning circumstances existing at the time of the execution of the lease was admissible only if the lease, when considered in its entirety, was ambiguous on its face; that the test of uncertainty or ambiguity repeatedly has been stated as follows:

" 'Ambiguity in a conveyance does not appear until application of pertinent rules of interpretation to the face of the instrument leaves it *genuinely uncertain* which one of two or more meanings is the proper meaning.' (Our italics.) (*Roxana Petroleum Corp. v. Jarvis,* 127 Kan. 365, 372, 273 Pac. 661.)" (p. 131.)

In the Lawrence case it was further said:

"Facts and circumstances surrounding the execution become competent only in the event the instrument is ambiguous *on its face and requires aid to clarify its intent.* . . . The interpretation of a written contract, free from ambiguity, is a judicial function and does not require oral testimony to determine its meaning. . . . Oral testimony . . . is not admissible for the purpose of adding provisions which vary the terms of a contract found to be unambiguous, on its face, under proper rules of construction." (p. 131.) (Our italics.)

In *Maltby v. Sumner*, 169 Kan. 417, 219 P. 2d 395, which involved an agreement to compromise and settle all differences between the parties, it was said:

"A contracting party is under a duty to learn the contents of a written contract before signing it and if, without being the victim of fraud, he fails to read the contract or otherwise to learn its contents, he signs the same at his peril and is estopped to deny his obligations thereunder. (17 C. J. S., Contracts, § 137.)

"In 12 Am. Jur., Contracts, § 137, the rule is stated thus:

" 'It is the duty of every contracting party to learn and know its contents before he signs and delivers it. He owes this duty to the other party to the contract, because the latter may, and probably will, pay his money and shape his action in reliance upon the agreement. To permit a party, when sued on a written contract, to admit that he signed it but to deny that it expresses the agreement he made or to allow him to admit that he signed it but did not

read it or know its stipulations would absolutely destroy the value of all contracts.'

. . . . . . . . . . . . . .

" 'What plaintiffs in reality are attempting to accomplish by their allegations is to vary the written provision of the compromise agreement which states it was a 'settlement of *all differences heretofore existing* between them. . . .' (our italics) by substituting therefor the words, 'a settlement only of differences pertaining to the residence property and furnishings.' Similar allegations in a pleading have been held to be nullities. [Citations.]

"The purpose of the rule requiring a contracting party to learn the contents of an instrument before signing it is to give stability to written agreements and to remove the temptation and possibility of perjury, which would be afforded if parol evidence were admissible to vary the terms of such instruments. (12 Am. Jur., Contracts, § 137.)" (p. 429.)

Appellee was successful in getting the trial court to reform the written contracts here involved and that is also what he is trying to have this court do on appeal. In accomplishing this result the trial court varied the terms of the contracts concerning the transfer of the franchise in accordance with the oral evidence and testimony having to do with the requirements of the Pepsi Cola Company after appellee had surrendered his franchise to it and before appellants could be issued a new franchise.

In *In re Estate of Koellen,* 162 Kan. 395, 176 P. 2d 544, the question involved an instrument which might be capable of dual interpretation and in holding it was an agreement and not a testamentary document the trial court considered oral testimony and evidence of surrounding facts and circumstances which it thought necessary to arrive at the intent of the parties. On appeal it was held this can be done only when the instrument is ambiguous on its face. The rule was there stated:

"What an instrument is intended to accomplish must be gathered from its four corners and not from single words, isolated phrases or even sentences. Facts and circumstances surrounding its execution become competent only in the event *the instrument is ambiguous on its face and requires aid to clarify its intent.*" (Syl. ¶ 2.) (Our italics.)

The trial court in the instant case did not actually find nor does the record affirmatively show that the contract of June 30, 1951, was ambiguous or unambiguous, but it may be inferred that the court could have been of the opinion the contract was ambiguous. Let us assume, but not decide, that the trial court did actually rule the contract ambiguous. We have the same duty the trial court had to decide whether the contract was ambiguous on its face.

In *Klema v. Soukup,* 175 Kan. 775, 267 P. 2d 501, it was said:

". . . the contract being in writing, we have the same duty as did the trial court to determine the question. [Citations.] Under rules stated, we examine the contract to determine whether or not it is free from ambiguity. . . . We are not concerned with whether the arrangement evidenced by the contract was prudent or not, but only with whether the contract is clear and free from ambiguity or the converse." (pp. 779, 780.)

In *Shannep v. Strong,* 160 Kan. 206, 211, 160 P. 2d 683, which was a will case, the elementary rule was stated that courts are required to effectuate not their own desires or notions of what the testator wisely should have done, but to give full force and effect to the testator's actual intent in the disposition of his own property. The same rule applies to the case at bar.

The above rule was stated in a little different way in *State Highway Construction Contract Cases,* 161 Kan. 7, 65, 166 P. 2d 728, where war had impaired contractors from performance of contracts to build roads. In a quotation from 137 A. L. R. 1217, it was there said:

" 'In applying this doctrine the courts disclaim any assumption of power to absolve the promisor on the ground that to require performance is inequitable, but assume merely to give effect to an implied term of the contract that the situation with reference to which it was made shall remain essentially unchanged. The attractiveness of this doctrine lies in its appearance of even-handed justice. It is, however, open to grave objection as departing from the simple and certain rule that the parties' relative claims upon and duties in respect of each other are conclusively fixed and defined by the terms of their own written contract, and as substituting therefor an inquiry, necessarily speculative, into the mental reservations with which the parties made their bargain. To entertain such a doctrine is to substitute uncertainty for certainty, and to create rather than to avoid the necessity of litigation.' " (p. 65.)

The above case stated a rule laid down by two authorities (Restatement of Contracts, § 455, comment 1; Williston on Contracts [Rev. ed.], pp. 5411-12) and then concluded:

"Both authorities agree that the second statement, 'I cannot do it,' never relieves the promisor, the reason being that the promisor has agreed and definitely bound himself to perform, and cannot be heard to say otherwise." (p. 67.)

We observe from the foregoing that it is not the function of courts to make contracts; their function is to enforce them as made. (See, also, the later case of *Brungardt v. Smith,* 178 Kan. 629, 290 P. 2d 1039.)

In view of the full treatment of this subject by our own court in

previous opinions, it will serve no good purpose to discuss general authorities which have been cited by counsel. The case was well and capably tried by counsel, and the record was expertly presented to this court. All questions presented have not been treated for the reason that in determining the correctness of the trial court's order reforming the contract we have determined the appeal.

We conclude the trial court erred in reforming the contract so far as the agreement on the part of appellee to secure the transfer of the Pepsi Cola franchise from himself to appellants was concerned by substituting therefor a contract of the court which in effect relieved appellee of performance. As a result the trial and judgment did not determine the rights and duties of the parties under the terms of their plain and unambiguous contract but determined those rights under a contract made for them by the court. The appellants did not receive a fair trial.

The judgment of the trial court is reversed and a new trial is ordered.

HARVEY, C. J., and WERTZ, J., not participating.