**ASHLAND OIL AND REFINING COMPANY, Plaintiff-Appellant,**

v.

**CITIES SERVICE GAS COMPANY, Defendant-Appellee.**

No. 71–1500.

United States Court of Appeals, Tenth Circuit.

June 21, 1972.

Gerald Sawatzky, Wichita, Kan., and L. E. Stringer, Oklahoma City, Okl. (Arloe W. Mayne, Ashland, Ky., and J. M. O'Loughlin, Meadville, Pa., Crowe, Dunlevy, Thweatt, Swinford, Johnson & Burdick, Oklahoma City, Okl., and Foulston, Siefkin, Powers & Eberhardt, Wichita, Kan., of counsel, on the brief), for plaintiff-appellant.

Daniel R. Hopkins, Oklahoma City, Okl., and Mark H. Adams, II, Wichita, Kan. (Mark H. Adams of Adams, Jones, Robinson & Malone, Wichita, Kan., Chartered, on the brief), for defendant-appellee.

Before CLARK,* Associate Justice, and HILL and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

Plaintiff-appellant instituted this diversity action in the District Court for the District of Kansas seeking damages against appellee, Cities Service Gas Company, for alleged breach of contract. The suit is based on a contract in which Ashland, as a successor in interest to United Producing Company, was obligated to sell most of the natural gas which it produced in the Hugoton field in Kansas to Cities Service Gas Company, an interstate wholesale natural gas distributor. Under the contract Cities was obliged to purchase the supply thus dedicated to its needs.

The central issue in this case has to do with a species of impossibility of contract performance growing out of a supervening change in the law. The impossibility does not go to performance of the contract as a whole, but merely to an undertaking of Cities designed to make an adjustment in the event that Cities failed to purchase the quantity it had obligated itself to take.

There are four distinct claims of Ashland. In substance Ashland has alleged:

1. That during the year 1963 Cities failed to purchase the quantity of gas which it had obligated itself to purchase and refused to abide by other provisions of the agreement which Ashland claims came into play in the event of there being underages in Cities' purchases. Specifically, it is alleged that it was impossible for Ashland to consent to withdrawal of acreage to other purchasers following a supervening event, namely, acquiring of jurisdiction by the Federal Power Commission, and that as a result

* Associate Justice, Retired, United States Supreme Court, sitting by designation.

Cities' alternative promise to pay for the gas which it did not use became operative. Damages are alleged to be $1,094,014.29.

2. The second count is similar to the first except that the decrease in purchases was smaller and the damages were also reduced to $287,336.77; this count refers to the year 1964.

3. That Cities failed to act in good faith in the performance of its contract by diligently receiving and marketing Ashland's gas so as to use as much of the available supply as it reasonably could. In excess of five million dollars is demanded in damages for this.

4. The fourth claim based on the failure of Cities to cooperate in Ashland's petition to the Federal Power Commission has been apparently abandoned on this appeal and thus it need not be considered.

The crucial issue in the case is that briefly described in count 1 above, namely, the underages in purchases which existed in 1963 and the legal consequences which flow from the supervening change in the law. The question is whether this rendered inoperative the promise of Cities to permit Ashland to withdraw or release from dedication under the contract the quantity of acreage which the agreement provided for. Assuming that performance of this promise was impossible, the remaining question is whether the alternative undertaking by Cities to pay for the deficiency becomes operative. Ashland contends that it does; Cities' position is that the change in the law did not render the performance impossible.

The trial court ruled in favor of Cities Service and against Ashland and summary judgment was accordingly entered. Ashland had also filed a motion for summary judgment and this, of course, was denied.

The court ruled that the provision was operative and that here Cities did all that it was required to do in order to fulfill its promise.

The contract was entered into in 1948. It recites that Cities is engaged in the purchase of natural gas for sale at wholesale to distributors in town and communities in various parts of the country and that it must have a supply of merchantable natural gas sufficient over a long period of time to meet the demands of its customers in the widely distributed markets. The undertaking was to sell and deliver on the one hand, and purchase and receive on the other, all natural gas produced on the acreage specified. The quantity of gas to be purchased was 80 percent of the difference between "the sum of the current allowables assigned to Ashland's wells and the quantities of gas reserved by Ashland during any contract year." The embattled provision of the contract provides as has been noted for alternatives available to Cities in the event that it failed to purchase the minimum quantities provided by the contract during any contract year. Cities agreed either to pay Ashland for the deficiency at contract price or to permit Ashland to withdraw and release from the dedication an amount of acreage roughly equivalent to the gas underage for that contract year. The contract went on to provide that if Cities elected to pay for the gas which it did not take that it had the right during the next succeeding year to take delivery of it without further payment. The contract further stated that if Cities did not elect to pay for the deficiency, then Ashland could elect within 120 days from the end of the contract year whether it would or would not withdraw from dedication as provided in this particular clause.[1]

It is clear from the terms of the contract that Cities was not obligated to

---

1. The text of this provision is as follows:
    * * * In the event of the failure of Cities to receive the aforesaid minimum quantities of gas during any such contract year, Cities agrees either to pay

Seller for such deficiency at the contract price currently in effect or to permit Seller to withdraw and release from the dedication under this contract the amount of acreage which bears the

take all of Ashland's production, but there *was* a firm commitment to take a minimum quantity, 80 percent, or to make adjustments to Ashland if this percentage of "allowables" was not purchased. The term "allowables" as used in the contract refers to the amount which Ashland could produce under the quota set under Kansas law for each well. Even though Cities was required generally to take 80 percent of the allowables, the contract recognized that Cities might not always take this amount, and that was the reason for the alternative options which were given to Ashland to pay or to permit withdrawal.

The parties agreed to further the performance of the agreement and to refrain from obstructing any undertaking imposed by the agreement. Another provision stated that the agreement was subject to all legislation and all applicable orders of government agencies. The parties agreed that if any such laws modified the contract, they would nevertheless continue to perform under the agreement as modified.

As is apparent from what has been said, Cities did not take the 80 percent minimum quantity in either 1963 or 1964, and it did not pay for the underages during these years. Ashland did not

formally apply to release acreage in connection with the 1963 underages, but it did so in 1964. In this latter year it not only notified Cities, but filed application with the Federal Power Commission for permission to withdraw acreage from dedication. This application was denied some two years after the filing in Federal Power Commission Opinion No. 527 which was issued August 15, 1967. The decision of the Commission was based on its standard of public convenience and necessity and was not an adjudication as to the meaning of this contract. Cities opposed the application of Ashland claiming that it was contrary to the public interest for Ashland to be allowed to withdraw the acreage.[2] Evidence in the record in the form of affidavits which are not controverted is to the effect that Ashland did not attempt withdrawal for the year 1963 because it realized that it would be futile to attempt withdrawal of the quantity of acreage subject to possible withdrawal during that year. According to further attestations in the affidavits, Ashland was advised by Cities Service that such an effort would be futile.

Since 1964 Cities has taken at least the 80 percent minimum and in the year 1965, according to some evidence in the

same proportion to the total acreage dedicated hereunder as such deficiency in gas purchased hereunder bears to the obligation of Cities, plus the gas reserved by Seller; such acreage to be selected by Seller. In the event that Cities elects to pay for such deficiency, it shall evidence such election by paying for same within sixty (60) days after the end of the contract year in which such deficiency occurred; and in the event of such payment by Cities, it shall have the right during the next succeeding contract year to take, without further payment, in addition to the quantities required to be taken during such year, the quantity of gas so paid for but not actually taken; provided that in making up any such deficiency Cities shall not take gas from Seller's wells at a rate in excess of 135% of the current daily allowables.

In the event of any such deficiency being incurred by Cities during any

contract year, and in the further event that Cities does not elect to pay for such deficiency within sixty (60) days after the end of such contract year, Seller shall elect within one hundred twenty (120) days from the end of such contract year, by written notice given to Cities, whether it will or will not withdraw from dedication as permitted by this Section, and upon failure of Seller to elect to withdraw acreage from dedication within said period of one hundred twenty (120) days from the end of the contract year, Seller's right to withdraw from dedication for that particular deficiency shall terminate.

2. This action of Cities is not shown to have brought about the outcome, but it did evidence willingness of Cities to exploit Ashland's disadvantageous position.

record derived from the FPC proceedings, it took enough gas to offset the 1964 deficit so that Ashland's out-of-pocket loss for the year 1964 would appear to be limited to the interest lost.

In connection with its third claim. Ashland contends that the contract is to be construed so as to imply a condition that Cities would use reasonable diligence to purchase as much of Ashland's products as possible, even quantities in excess of 80 percent, and that Cities failed to comply with this implied condition, but instead developed new and unnecessary sources rather than modifying its equipment to permit it to receive additional gas from Ashland. Cities, on the other hand, takes the position that Ashland fractured its wells so as to increase its production and its allowables in an amount greater than the increase in production from wells of other producers in the Kansas-Hugoton field, whereby had it exceeded the 80 percent of allowables it would have violated its agreement to take ratably from other producers in the area.

In granting Cities' motion for summary judgment the trial court ruled:

That the promise of Cities to permit Ashland to withdraw and release from the dedication a proportionate amount of acreage in fact had not in law failed. On this the court said:

\* \* \* First, withdrawal is not legally impossible as such; and second, the obligation to *permit* withdrawal is on the defendant, but this does not mean that Cities must effectuate the withdrawal—only allow it if the plaintiff elects and is able to effectuate it.

The above was the court's way of saying that the doctrine of impossibility did not apply to this particular undertaking of Cities. What the court was saying was that withdrawal of the acreage was still possible and that the change merely rendered it more difficult.

In effect the judge said that Cities could still give its permission and fulfill its undertaking, and the fact that this did not fulfill the promise of Cities was irrelevant—that success in withdrawal (which the contract contemplated) was not necessary in order to render the permission impossible. The judge also stressed the fact that the impossibility doctrine ordinarily came up in the context of a defense to an action for breach of contract instituted by the promisor against the promisee. An added bolstering reason given was that the Commission, so the court said, had to determine whether the contractual right to withdraw existed as a prerequisite to determining whether the withdrawal was in the public interest,[3] and that this was binding.

The summary judgment was also denied Ashland and granted to Cities on count 2 having to do with the contract year 1964. Again, the ruling was based on the trial judge's view of impossibility; secondarily, the court rejected Ashland's contention that Cities was obligated, in view of its promise, to refrain from opposing its effort to withdraw in the proceedings before the Commission. The court held that Cities was wholly justified in opposing withdrawal notwithstanding its promise to permit it since it was simply taking a position on the public interest issue.

The court likewise rejected Ashland's claim that Cities violated its implied obligation to market diligently and to perform the contract in good faith free of discriminatory preferences. The judge held that this undertaking could not be implied because the contract was clear and unambiguous as to the rights of the parties and this language governed.

So, in effect, the court ruled that Ashland's claims were completely lacking in

---

3. We fail to see that this has any underlying bearing on the question since it was a wholly collateral hearing. The Commission did not have the present controversy before it. It was entirely concerned with the public interest aspect as a convenience and necessity question. Moreover, we are not engaged in reviewing the Federal Power Commission's decision.

merit and that Cities was entitled to prevail on each and all of the disputes.

## I.

The countervening legal occurrence which Ashland claims rendered Cities' undertaking to permit withdrawal of acreage legally impossible is the decision of the Supreme Court in Phillips Petroleum Co. v. State of Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954), which held that an independent natural gas producer which sold gas to an interstate pipeline company was not exempt from regulation by the Federal Power Commission. The question is whether this contributed a supervening legal change which served to render impossible the performance of the promise of Cities to permit withdrawal of acreage and, secondly, whether the alternative adjustment provision, namely, purchase or payment, became enforceable.

The *Phillips Petroleum* case was decided some six years after the instant contract was executed and became effective. Its effect was that independent gas producers, even though operating intrastate selling gas to interstate pipeline transmission companies such as Cities, were thenceforth subject to the jurisdiction of the Federal Power Commission in abandonment or withdrawal matters. Before that time independent producers such as Ashland contracting with a wholesale distributor such as Cities could validly contract with respect to the withdrawal of acreage from dedication to the needs of the contracting wholesaler.[4]

As the trial court correctly pointed out, the question of impossibility of performance ordinarily arises in a context different from the present one. The classic case is one in which the promisee sues for breach of contract and the promisor defends on the ground of impossibility of performance of the entire contract. But this is by no means the only way the question can arise. Ashland here is alleging that the undertaking of the *promisor* is not capable of being performed and that as a result the promisee is not receiving what it bargained for, namely, a form of compensation or at least an opportunity to make itself whole by the withdrawal of proportionate acreage. Since this avenue is no longer open, redress is sought in accordance with the alternative method (payment) which Cities specifically promised. There is ample precedent in support of the assertion of impossibility by a promisee in this context and fashion. See 84 A.L.R.2d 66 under the heading *Impossibility of one Alternative.*

■ Viewing the contract in totality its objects were, first, to insure a supply of natural gas to Cities Service by dedication of specific acreage and, second, to give to the seller some guarantee that he would be able to sell that which he had dedicated to the buyer's market needs. Therefore, it must have been the intention of the parties to carry out these general objectives in a manner which would not result in one party being placed at a severe disadvantage while the other party was gaining an unexpected windfall. To construe the contract so as to produce this effect is inequitable and out of harmony with the mentioned objectives. That this is an underlying concern in construing clauses such as those which are before us is pointed out in 6 Corbin on Contracts 324–325 § 1321. According to this author, where impossibility exists custom dictates that the risk of loss be placed on the person making the promise.

---

4. From the record before us there is no indication that any type of permission from any agency was required. In its brief Ashland states, and Cities does not dispute the statement, that all that was necessary was the closing of one valve and the opening up of another. Thus, for all intents and purposes the decision of the Supreme Court in the *Phillips* case made a substantial change in the conditions which had existed as between these parties prior to the decision. As a result of the Court's ruling, it was no longer in the power of the Cities Service Company to grant the permission provided for in the contract.

In the early law impossibility did not discharge the contractual obligation and the very earliest cases recognizing impossibility as a defense appear in the middle of the Nineteenth Century, and the courts gave no relief unless the impossibility was absolute. See 6 Corbin, *supra*, 322.

Similarly, the decisions of the Kansas Supreme Court have shown somewhat of an evolution from the very early decisions such as Western Drug Supply & Specialty Co. v. Board of Administration, 106 Kan. 256, 187 P. 701 (1920). See also Hampe v. Sage, 87 Kan. 536, 125 P. 53 (1912); Hurless v. Wiley, 91 Kan. 347, 137 P. 981 (1914); and Carter v. Wilson, 102 Kan. 200, 169 P. 1139 (1918). These decisions all held an obligation not to be impossible of performance if it could be performed at all.

The more recent decisions of the Supreme Court of Kansas have had a general approach to the question of impossibility which has been less restrictive. See Berline v. Waldschmidt, 159 Kan. 585, 156 P.2d 865 (1945); Freeto v. State Highway Commission, 161 Kan. 7, 166 P.2d 728 (1946); and Bailey v. Talbert, 179 Kan. 169, 294 P.2d 220 (1956). The Kansas Supreme Court did not find impossibility in either *Berline* or *Freeto,* but it did recognize the applicability of standards expounded by Corbin and Williston and also in the Restatement of Contracts. While we have been unable to find any Kansas decision which deals with the problem of the case at bar, namely, avoidance of one of two alternative methods of performance rather than avoidance of the entire contract, we note that the Kansas court has held in each of its decisions that the promisor was not entitled to escape the performance of the entire contract because of alleged supervening impossibility held by the court to have been foreseeable at the time that the contracts were entered. Thus, the Kansas court has required a promisor to perform his contract and has shown a reluctance to excuse him, a position which is not out of harmony with that of the plaintiff in the instant case. Here the effort is also to enforce the contract by activating an alternative promise following the failure of an optional undertaking. The court is then not placed in the position of rewriting the parties' contract, but rather of enforcing it. Hence, we perceive no conflict between the Kansas decisions and the enforcement of the promise which the promisor has expressly undertaken.

There are numerous examples in the cases of impossibility resulting from legal prohibition which need not be expounded. See the cases collected in 84 A.L.R.2d 76, 77, 81. See also 6 Corbin, *supra,* chapter 76, and, particularly, § 1346, Prevention by Order or Decree of Court or Administrative Order. The Restatement of Contracts § 458 provides in part:

> A contractual duty or a duty to make compensation is discharged in the absence of circumstances showing either a contrary intention or contributing fault on the part of the person subject to the duty, where performance is subsequently prevented or prohibited
>
>       *    *    *    *    *    *
>
> (b) by a judicial, executive or administrative order made with due authority by a judge or other officer of the United States, or of any one of the United States.

Impossibility is defined in § 454 of the Restatement as follows:

> In the Restatement of this Subject impossibility means not only strict impossibility but impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved.

■ In light of the above, we must disagree with the conclusion of the trial court that Cities could satisfactorily perform that which was required of it by the questioned provision by giving its permission to the withdrawal of acreage. This loses sight of the substantial change in the relationship between the parties brought about by the *Phillips*

case. After that it was no longer possible for Cities to give effective permission. Ashland had to activate the process of the Federal Power Commission. This meant not only expense, but difficulty and delay. An effort to obtain this permission was doomed to failure as indicated by the opinions of the Commission and the result of the 1964 effort. The contract contemplated that Cities would have authority to *grant* the withdrawal permission; hence the withdrawal provision was effectively removed as a means of adjusting the underages in purchases. The end result was that the entire character of the contract was changed. An undertaking which had had mutuality became one in which Cities acquired an unexpected windfall and Ashland suffered an unanticipated detriment. We conclude that the trial court's construction of the agreement was error; that the promise of Cities to permit withdrawals was impossible for Cities to perform and that the clause is subject to avoidance by Ashland.

## II.

What is the consequence of failure because of impossibility of one of two alternative performance provisions in a contract? The cases hold that where a contract requires a promisor to do a certain thing or to do something else the impossibility of one mode of performance

"does not discharge him from his obligation to render the alternative performance which has not become impossible. See the following cases: Yankton Sioux Tribe v United States (1926) 272 US 351, 71 L ed 294, 47 S Ct 142; Crowley v Commodity Exch., Inc. (1944, CA2 NY) 141 F2d 182; Glidden Co. v. Hellenic Lines, Ltd. (1960, CA2 NY) 275 F2d 253; Edward G. Acker, Inc. v Rittenberg (1926) 255 Mass 599, 152 NE 87."[5]

One of the best examples of the application of this doctrine is Yankton Sioux Tribe v. United States, *supra.* Here an Indian treaty provided that if the government questioned the ownership of certain reservation lands the Secretary of the Interior should refer the matter to the United States Supreme Court for a decision, or, alternatively, if it failed to do so within one year after ratification of the agreement by Congress this would be regarded as a waiver which could result in vesting the land and fee in the tribe. This was antecedent condition of impossibility, but in the course of its opinion the Supreme Court made clear that the rule applied as well to subsequent impossibility.

The other cases which are cited in 84 A.L.R.2d also illustrate the validity of the above mentioned rule. Glidden Co. v. Hellenic Lines, Ltd., *supra,* involved charter parties for voyages from India to the United States Atlantic port and provided that the voyages were to be via Suez Canal or the Cape of Good Hope or the Panama Canal at owner's option. The Suez Canal was closed; however, the Court of Appeals for the Second Circuit held that this did not frustrate the performance since there were alternative routes.[6]

The above described principle of alternative undertakings is fully applicable to our case. Failure of the withdrawal promise could not frustate performance of either the entire contract or the op-

---

5.  84 A.L.R.2d 66. Section 469 of the Restatement of Contracts reads as follows:
    Impossibility of performing one or more but less than all of a number of performances promised in the alternative in a contract discharges neither the duty of the promisor if by the terms of the contract he had the privilege of choice, nor the duty of the promisee if he had that privilege, but merely destroys or limits the possibility of choice;

except where a contrary intention is manifested or the impossibility exists at the time of the formation of the contract and there is such a mistaken assumption of the existence of a fact as renders the contract voidable under the rule stated in § 502.

6.  *Cf.* H. B. Zachry Co. v. Travelers Indemnity Co., 262 F.Supp. 237 (N.D.Texas 1966).

tional alternative of performance. Ashland is entitled to summary judgment on this liability question.

## III.

Based on the assumption that impossibility of performance of the withdrawal provision is determined to exist, Cities next argues that Ashland waived its right to pursue this claim for payment under Cities' alternative option. As far as we are able to ascertain, the sole basis for this is the testimony of one Ray Althouse, Manager of Gas Sales for Ashland, before the Federal Power Commission.[7]

When the quoted testimony is examined in its full context, it would appear that the waiver referred to is the right to request withdrawal of acreage resulting from the 1963 underages, and this is the explanation which is given by the witness in an affidavit found in the record before us.[8] Although the described testimony seems somewhat unimpressive as a renunciation of all rights of Ashland to pursue other remedies, it is nevertheless a matter of fact upon which we do not now rule. We consider

the issue factual, thus requiring a ruling by the trial court.

There are other related questions such as if the testimony expressed intent to waive Ashland's right of action, whether it was a binding renunciation or release. Inasmuch as the cause has to be remanded for further proceedings, the trial court can consider this issue.

■ As mentioned earlier in this opinion, the trial court's view that Ashland is bound by the Federal Power Commission ruling that Ashland had a contractual right to withdraw and that this precludes or estops Ashland is not tenable, thus: first, because no determination of legality was made by the FPC and, second, because the proceedings before that body were wholly different. Contrary to the trial court's conclusion that the FPC was required to rule on the question, it appears to us that any FPC ruling was collateral. Hence, there is a lack of a basis for application of either collateral estoppel or res judicata.

## IV.

■ Finally, we consider count 3 of the complaint involving Ashland's allega-

---

7. In those proceedings Mr. Althouse was questioned by a member of the FPC Staff as follows, in connection with determining exactly what was before the Commission for disposal:

  Q. * * * Cities Service has taken ten million Mcf less than the allowables assigned by the Kansas Corporation Commission. Now, that ten million figure is made up of eight million Mcf for 1963 and two million for 1965 [sic]; that is the make-up, isn't it?
  A. Approximately, that is correct, yes.
  Q. On that eight million Mcf Ashland seeks no relief in this proceeding, does it?
  A. Not in this proceeding.
  Q. You mean you are pursuing some other relief?
  A. Not at present.
  Q. As far as this present moment goes, Ashland has abandoned any right to claim any relief for that eight million figure of 1963?
  A. We did not elect at that time to request acreage to be withdrawn.
  Q. Did you do anything else about it?
  A. We had discussions with Cities, of course.

Q. There is no formal action before any regulatory body or court to enforce that eight million?
  A. No.
  Q. As of this moment, the eight million Mcf has more or less been abandoned?
  A. It has been waived, yes.
  Q. It has been waived?
  A. Yes.
  Q. So your claim here is based exclusively on the two million under production below the 80 percent figure for 1964?
  A. That is correct.

8. "I was clarifying for FPC staff counsel that the 1964 contract year was there involved, and attempted to make clear that any contract right for withdrawal for the year 1963 was not involved in that proceeding. Ashland was then planning to file suit against Cities for payment for the 1963 deficiency. I have at all times advised Cities that Ashland would enforce all its rights pertaining to such contract, and to my knowledge Ashland has not waived its right to payment for such deficiency." (A., p. 273).

tion that Cities breached an implied duty under the contract to exercise due diligence to take all of Ashland's allowables. Questions of fact are raised, and we conclude that the trial court erred in granting Cities' motion for summary judgment.

The trial court determined that the express language of the contract setting forth a minimum take obligation of 80 percent allowables precluded the existence of the implied duty urged by Ashland. The judge reasoned that if an agreement contains an express covenant, the possibility of an implied covenant of a different contradictory nature is excluded, and so the inquiry is whether there is such an express covenant.[9]

The contract is couched in terms of an agreement on the part of Cities to purchase "all" natural gas produced by seller, "subject to the terms and conditions and within the limitations" set forth by the contract. As we pointed out above, the provisions dealing with the 80 percent minimum take obligation are detailed and specific.

Is this contract ambiguous on its face? It plainly states that it deals with a primary obligation to take "all" of Ashland's production, and then in equally plain terms states that this primary obligation is subject to various limitations heretofore mentioned. Thus, inability on the part of Cities to take full production was contemplated by the parties, as we pointed out in the first part of this opinion, and express conditions were set forth to govern the conduct of the parties under that circumstance. Of course, this itself is not necessarily inconsistent with a requirement to exercise due diligence in marketing Ashland's gas, because even with such

diligence it could well be that not all allowables could be taken. There is, however, also the provision that Cities must take ratably with other wells producing for Cities in the field (Article II, Section 2(c); fn. 1), at least if such ratable taking would result in greater purchases from Ashland than would the 80 percent minimum. Does this change the analysis? We think not, for it is merely a provision for a different *minimum* take in the event that circumstances affecting the parties change. We see nothing inconsistent in *minimum* purchase requirements, which are to be met in any event regardless of other circumstances, and a duty to exercise due diligence to take full allowables—in other words, a duty to do *as well as possible* in marketing and selling producer's gas. The latter sets a goal toward which Cities is obligated to work to the best of its ability; the former sets up a required level below which Cities is obligated not to fall, no matter what.

Cities relies on Kingsley v. Western Natural Gas Co., 393 S.W.2d 345 (Tex. Civ.App.1965) in support of its proposition that the minimum take provision in effect. *Kingsley* is not in point. It contained a covenant obligating the purchase of certain quantities of gas in excess of the minimum take. No similar covenant is present here. In *Kingsley* it was the presence of this specific provision that governed the decision. The absence of such a clause in the instant contract, taken together with the generally-accepted Kansas rule imposing an implied obligation to exercise due diligence, indicates a lack of intention manifested on the face of the contract to deal expressly with takings in excess of the minimum here.

9.   See Duvanel v. Sinclair Refining Co., 170 Kan. 483, 227 P.2d 88 (1951) ; Mills & Willingham, Law of Oil & Gas, § 108.
    Cities concedes what we also consider to be the correct rule, that absent any express provisions negativing such an implication, Kansas law will imply a covenant to diligently explore, drill, produce and market the product in oil and gas leases. See Cities' brief, p. 18. This is the general rule in oil and gas leases,

see Summers, Oil and Gas, § 400 (1954 ed.), and has been adopted in Kansas, see Collins v. Mt. Pleasant Oil & Gas Co., 85 Kan. 483, 118 P. 54 (1911), and recognized by the 8th Circuit prior to the formation of the 10th Circuit, see Brewster v. Lanyon Zinc. Co., 140 F. 801 (8th Cir. 1905) and recognized by this Circuit, see Wolfe v. Texas Co., 83 F.2d 425 (10th Cir. 1936).

In view of the general objectives of this contract which were to sell Ashland's full production and for Cities to buy it subject to mentioned conditions, and considering the Kansas law which was mentioned, the contract was certainly open to a ruling that an implied covenant of due diligence existed. However, the trial court did not appraise the contract in this light and did not determine whether there was a breach of any such implied covenant. Hence, proper procedure requires submission of these unanswered factual determinations to it.

\* \* \*

Finally, the year 1964 is governed by the rulings on impossibility which are enunciated in parts I and II above.

Should a money judgment be entered based on the obligation of Cities to pay for underages (less than the 80 percent), then consistent with the corollary provision Cities should have one year within which to take delivery on quantities thus paid for.

The judgment is reversed and the cause is remanded for further proceedings in accordance with the orders and directions contained herein.