(841 P.2d 1093)

No. 66,959
No. 67,651

CATHY R. MINER, *Appellee,* v. FARM BUREAU MUTUAL
INSURANCE COMPANY, INC., *Appellant.*

Opinion filed November 20, 1992.

*Larry R. Mears* and *Ellen J. Richardson,* of Larry R. Mears, Chartered, of Atchison, for appellant.

*Richard P. Senecal,* of Duncan, Senecal and Bednar, Chartered, of Atchison, for appellee.

Before GERNON, P.J., DAVIS, J., and RICHARD W. WAHL, District Judge Retired, assigned.

WAHL, J.: This decision considers the consolidated appeals filed by Farm Bureau Mutual Insurance Company, Inc. (Farm Bureau). In Case No. 66,959, the appeal is from numerous alleged trial errors and the jury's verdict finding Farm Bureau liable for additional personal injury protection (PIP) benefits in the form of additional wage loss benefits, substitution benefits, and rehabilitation benefits. In Case No. 67,651, the appeal is from the trial court's judgment granting interest on the judgment, future medical benefits, and attorney fees and expenses to Cathy R. Miner.

On or about August 6, 1988, Miner and her husband, Bob Miner, were injured in a one-car accident when a deer ran in front of the vehicle Miner was driving, causing her to swerve and hit an embankment. Although not treated on the night of the accident, Miner later began having shooting pains in the neck and severe headaches. She sought treatment from Dr. Farr, a chiropractor, but was later referred to her family physician, Dr. Eplee, for continued treatment. During the course of the next few years, Miner was referred to many doctors and programs for treatment.

On September 4, 1988, Miner sent an application to Farm Bureau for loss of wages and medical benefits under the PIP provision of her automobile policy. Although Miner was self-employed at the time, managing the Whiskey Creek Tavern, she notified Farm Bureau that her monthly salary was $1,000. Miner was informed that Farm Bureau would pay 85% of the cost of replacing Miner but needed verification of what the person was paid and a letter from Miner's doctor verifying that she was medically disabled from the accident and unable to work. Thereafter, Miner submitted, as documentation of her wage loss, an

affidavit signed by Miner and Mary Navinsky, Miner's mother, to show that Navinsky was hired to replace Miner at the tavern at $5 per hour or $300 per week. Miner continued to send Farm Bureau statements showing Navinsky's work hours on a regular basis as evidence of wage loss. Farm Bureau paid lost wages to Miner based on the hours turned in at the statutory rate of 85% of the $5 per hour claimed to be paid to Navinsky. Farm Bureau continued to pay Miner's medical expenses and wage loss until it was informed by Dr. Kelly that Miner had no work restrictions and could work. Based on Dr. Kelly's report, Farm Bureau sent Miner a letter advising her that her wage loss benefits would be terminated as of July 7, 1989. Farm Bureau resumed paying wage loss benefits on September 5, 1989, after receiving a letter from Dr. Eplee stating Miner had suffered a relapse. Finally, based on the opinions of Drs. Kelly, Maeda, Shriwise, Eplee, and Reddy, Farm Bureau terminated the wage loss benefits a second time in November of 1989.

On April 27, 1990, Miner filed suit against Farm Bureau, claiming Farm Bureau refused to pay PIP benefits for medical expenses, wage loss, substitution services, and rehabilitation services pursuant to Miner's policy with Farm Bureau. A trial by jury resulted in a verdict against Farm Bureau in the amounts of $26,000 for wage loss, $4,500 for rehabilitation benefits, and $2,700 for substitution services, for a total verdict of $33,200. No amount was allowed for medical expenses. Thereafter, the trial court denied Farm Bureau's motion for judgment notwithstanding the verdict or in the alternative for a new trial and granted Miner's motion for interest, attorney fees, and clarification of future medical expenses. On July 31, 1991, Farm Bureau timely appealed from all judgments entered against it by the jury and trial court. After the first appeal was filed, the trial court denied Farm Bureau's motion for reconsideration of attorney fees. Farm Bureau appealed that denial also, and the appeals are consolidated before this court.

Farm Bureau argues it was error for the trial court to deny its motion for directed verdict and allow Miner's claims for additional PIP benefits to go to the jury because the claims were based on the company's failure to pay those benefits while Miner failed to establish a right to claim the additional benefits. Farm Bureau

further argues the trial court erroneously allowed Miner to present her Exhibit No. 35, a letter from Bob Miner to Farm Bureau, as a request for rehabilitation benefits when Miner had failed to respond to Farm Bureau's request for admissions and was thereby deemed to have admitted that no such request for rehabilitation benefits was made. Farm Bureau also contends the filing of the lawsuit does not fulfill the required notice for benefits needed under the no-fault law, K.S.A. 40-3110, and that Miner needed to present written notice and evidence of the amount of her loss on each benefit claimed before filing suit.

Miner contends it was not error for the trial court to allow her to present as evidence her Exhibits Nos. 33, 34, and 35 in spite of her failure to respond to the admissions because it is within the discretion of the trial court, under K.S.A. 60-236(b), to permit a withdrawal or amendment to the admissions where the party who obtained the admission has not proved the withdrawal or amendment prejudices that party. The parties' arguments regarding the appropriateness of the denial of Farm Bureau's motion for directed verdict will be considered under each loss benefit discussion.

Farm Bureau argues its motion for a directed verdict should have been sustained because Miner gave no written notice, substantiated by documented proof of cost incurred, to Farm Bureau of any claim for substitution and rehabilitation benefits or underpayment of wage loss before filing the lawsuit. The required notice is set out in K.S.A. 40-3110:

"(a) Except for benefits payable under any workmen's compensation law, which shall be credited against the personal injury protection benefits provided by subsection (f) of K.S.A. 40-3107, personal injury protection benefits due from an insurer or self-insurer under this act shall be primary and shall be due and payable *as loss accrues*, upon receipt of *reasonable proof of such loss* and the amount of expenses and loss incurred which are covered by the policy issued in compliance with this act. An insurer or self-insurer may require written notice to be given as soon as practicable after an accident involving a motor vehicle with respect to which the insurer's policy of motor vehicle liability insurance affords the coverage required by this act. *No claim for personal injury protection benefits may be made after two (2) years* from the date of the injury.

"(b) Personal injury protection benefits payable under this act shall be overdue if not paid within thirty (30) days after the insurer or self-insurer is furnished written notice of the fact of a covered loss and of the amount

of same, except that disability benefits payable under this act shall be paid not less than every two (2) weeks after such notice. If such written notice is not furnished as to the entire claim, any partial amounts supported by written notice is overdue if not paid within thirty (30) days *after such written notice is furnished*. Any part or all of the remainder of the claim that is subsequently supported by written notice is overdue if not paid within thirty (30) days after such written notice is so furnished *Provided,* That no such payment shall be deemed overdue where the insurer or self-insurer has reasonable proof to establish that it is not responsible for the payment, notwithstanding that written notice has been furnished. For the purpose of calculating the extent to which any personal injury protection benefits are overdue, payment shall be treated as being made on the date a draft or other valid instrument which is equivalent to payment was placed in the United States mail in a properly addressed, postpaid envelope, or, if not so posted, on the date of delivery. All overdue payments shall bear simple interest at the rate of eighteen percent (18%) per annum." (Emphasis added.)

To determine whether the filing of a lawsuit may be considered to be the giving of notice of a claim for PIP benefits under the statute requires this court to construe the legislative intent in enacting K.S.A. 40-3110. Interpretation of a statute is a question of law wherein appellate courts are not bound by the construction of the trial court. *Memorial Hospital Ass'n, Inc. v. Knutson,* 239 Kan. 663, 668, 722 P.2d 1093 (1986). "[T]he intent of the legislature governs when that intent can be ascertained." *Martindale v. Tenny,* 250 Kan. 621, Syl. ¶ 1, 829 P.2d 561 (1992). "When a statute is plain and unambiguous, the court must give effect to the intention of the legislature as expressed, rather than determine what the law should or should not be." *Martindale,* 250 Kan. 621, Syl. ¶ 2. The "court has no right to enlarge the scope of the statute or to amend it by judicial interpretation. [Citation omitted.]" *Coe v. Security National Ins. Co.,* 228 Kan. 624, 629, 620 P.2d 1108 (1980).

The language in K.S.A. 40-3110 is not ambiguous. As set out in subsection (a), the insurer does not become liable for payment until it has received notice of the claim by "reasonable proof of such loss and the amount of expenses and loss incurred which are covered by the policy," and the insurer may require "written notice to be given as soon as practicable after an accident." Subsection (b) provides that, where the entire claim is not submitted, the payment for only the losses claimed is due within 30 days, with any part or all of the remainder of the claim being payable

upon the submitting of supporting written notice from the claimant.

The language of K.S.A. 40-3110 states quite clearly that the legislature intended for a claimant not only to notify the insurer of the existence of the injury and possible claim, but also to notify the insurer of each benefit loss sustained and to provide reasonable proof of the accrual of that loss before any liability attaches on the part of the insurer. The purpose of requiring a claimant to notify the insurer of the claimed benefits is "to insure prompt payment for loss and to avoid the necessity and delay of litigation." *Burriss v. Northern Assurance Co. of America*, 236 Kan. 326, 331, 691 P.2d 10 (1984), *cert. denied* 474 U.S. 821 (1985). It is contrary to the plain language of the statute and its purpose of avoiding litigation to hold that a claimant need only give an insurer notice of his injury and possible claims. A claimant must also provide the statutorily required notice of the benefits claimed and provide supporting documentation evidencing the losses incurred before bringing action against the insurer on those claims.

"Notice by one party to another is frequently a condition precedent to the right to bring an action. Such notice may be required by express statutory enactment or by express agreement of the parties, or it may be implied by law." 1 Am. Jur. 2d, Actions § 81, p. 610. Accord *Bell v. Dennis*, 158 Kan. 35, 37, 144 P.2d 938 (1944).

"The general rule is clear that where a demand is an integral part of a cause of action, that is, where the duty to pay, to deliver the property in question, or to do some other act which constitutes an essential basis of the plaintiff's claim does not arise until after demand, then the demand must be made before the action is commenced." 1 Am. Jur. 2d, Actions § 84, p. 612.

Accord *Alliance Life Ins. Co. v. Ulysses Volunteer Fireman's Relief Ass'n.*, 215 Kan. 937, Syl. ¶ 2, 529 P.2d 171 (1974); *Sloan v. Employers Casualty Ins. Co.*, 214 Kan. 443, Syl. ¶ 2, 521 P.2d 249 (1974).

"A cause of action must exist *and be complete* before an action can be commenced; *suits commenced before the cause of action stated in the pleadings arises will generally be dismissed when proper objection is taken;* if a plaintiff has no valid and subsisting title or right to the subject of his action at the time of its commencement, he may not by the subsequent acquisition or perfection of such right or title remedy the defect so as to succeed in

the action. The subsequent occurrence of the conditions or facts necessary to make the cause of action complete will not avail the plaintiff in maintaining his suit. *The rights and liabilities of the parties—that is, their rights to an action or to judgment or relief—depend upon the facts as they existed at the time of the commencement of the action, and not at the time of trial. And it has been said that the nonexistence of a cause of action when the suit was begun cannot be cured by an amendment to the complaint or declaration to cover the subsequently accruing right.*" 1 Am. Jur. 2d, Actions § 87, p. 616. (Emphasis added.)

Evidence at trial showed no demand by Miner to Farm Bureau for reimbursement of substitution expenses, rehabilitation expenses, or recovery of amounts of underpaid lost wages before instituting this action.

The standard of review for directed verdict issues on appeal requires this court "to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought." *Anderson v. National Carriers, Inc.,* 10 Kan. App. 2d 203, 209, 695 P.2d 1293, *rev. denied* 237 Kan. 886 (1985). However, where the insured has not given the insurer written notice of the benefit sought, along with reasonable proof of the loss, the amount of the loss, and the expenses incurred which are covered by the terms of the policy issued, no cause of action has arisen and suit may not be brought regarding that particular benefit loss. The filing of a petition would be the last step taken by a claimant after the statutory notice has been given and the insurer has refused to make payment on the loss benefit submitted in compliance with K.S.A. 40-3110.

Even though public policy requires that all issues in a lawsuit should be tried in one trial, *Guillan v. Watts,* 249 Kan. 606, 616, 822 P.2d 582 (1991), the issue here cannot arise until damage is sustained, *i.e.,* the demand has been made and payment has been refused. The trial court's holding that the filing of the action gave notice of the claims in compliance with K.S.A. 40-3110 was in error. The trial court's denial of a directed verdict as to any claims not submitted to Farm Bureau with documentation of loss incurred is error and will be discussed in considering each benefit issue.

Farm Bureau argues it was error to allow Miner to sue for additional wage loss benefits under PIP provisions for time periods already submitted and paid for. Miner claims additional payment

for those periods based upon hours allegedly worked by Bob Miner and Navinsky. Farm Bureau contends Bob Miner's hours cannot be claimed because Miner did not meet her burden to provide written notice and documentation of those hours. Farm Bureau claims the additional hours allegedly worked by Navinsky should also be denied for failure of Miner to give notice of the claim and request payment. Lastly, Farm Bureau argues that Miner is not due any wage loss benefits after November 1989 because Farm Bureau never received any medical reports verifying her inability to work after that date.

Under the PIP provisions of Farm Bureau's insurance policy with Miner, Farm Bureau would pay her 85% of her monthly wages up to $1,750 for a period of 36 months. At trial, Miner admitted that she and her husband put together the statements submitted to the company regarding her wage loss. She admitted Farm Bureau paid her for all wage statements submitted based on the itemization of hours she gave as Navinsky's hours each week at $5 an hour. Although Bob Miner prepared the statement of wage loss expense signed by Miner and submitted to Farm Bureau, he admitted that he had never submitted anything to Farm Bureau for hours he allegedly worked. The application for benefits submitted by Miner showed her monthly income to be $1,000 a month. That amount is commensurate with the amount which she claimed was owed based on Navinsky's replacing her each month. Farm Bureau paid wage loss benefits to Miner on the amounts submitted, and Miner never complained of being underpaid.

Any claim for wage loss based on hours worked by Bob Miner should have been excluded from jury consideration because he never submitted notice, as required by the statute, that Miner was seeking wage loss benefits based on his replacement services, nor did he submit documentation to support his claim of hours worked for Miner. Miner's claim for additional payment of wage loss benefits for months already paid by Farm Bureau should also have been excluded for the same reason. Miner admitted all wage loss claims submitted to Farm Bureau were paid and no notice or request for additional amounts for those time periods was ever submitted to Farm Bureau.

Just as "a party may not invite error and then complain of that error on appeal," *Manley v. Wichita Business College*, 237 Kan. 427, 438, 701 P.2d 893 (1985), so an insured may not submit notice of claim with supporting documentation regarding amounts owed and then, after the insurer relies on it and pays that amount, claim error and file an action against the insurer claiming underpayment of the claim.

After Farm Bureau's termination of wage loss benefits based on the doctors' reports, Miner should have sought reinstatement of the benefits by submitting verification of her disability. To have wage loss benefits reinstated, Miner needed to show that "potential employment was accessible, obtainable and commensurate with her skills, educational background, work experience and any other relevant employment criteria" but her injury was causing her continued inability to work. *Morgan v. State Farm Mut. Auto. Ins. Co.*, 5 Kan. App. 2d 135, 142, 613 P.2d 684 (1980); K.S.A. 1991 Supp. 40-3103(b); K.S.A. 40-3110(a). Although evidence was presented that Miner had no work restrictions placed on her, the jury also had evidence before it showing that Miner had an eighth grade education, that she was trying to get her G.E.D. to enable her to be more employable but had so far failed, and that just about anything she had tried to do irritated her condition and required her to take a 20 to 30 minute break every hour. Miner testified she did not know any skill other than waitress duties. Dr. Eplee attempted to encourage Miner to go back to work, but the attempt was unsuccessful. Miner had a 14% to 38% strength loss in her left shoulder in 1991. Don Vander Vegt, a vocational consultant, testified that, based on the weight lifting restrictions of 15 to 20 pounds for Miner, the recommendation she avoid bending, and her pre- and post-injury employment skills, Miner could do only 3.3% of the jobs in the labor market.

Farm Bureau argues that, because Miner did not submit an application for substitution benefits prior to filing this lawsuit as required by the statute and the insurance policy, she was not entitled to those benefits and the trial court erred in letting this issue go to the jury. Miner admits she did not request payment of substitution benefits from Farm Bureau prior to filing this action. She contends, however, her failure to submit the required

application is not fatal because Farm Bureau did not inform her of the availability of the substitution benefits and further failed to investigate whether she needed that coverage.

Kansas has long held it to be "the duty of every contracting party to learn and know the contents of a contract before he signs and delivers it." *Bailey v. Talbert*, 179 Kan. 169, Syl. ¶ 4, 294 P.2d 220 (1956). "As a result of this duty, a person who signs a written contract is bound by its terms regardless of his or her failure to read and understand its terms." *Rosenbaum v. Texas Energies, Inc.*, 241 Kan. 295, 299, 736 P.2d 888 (1987). See *Vanier v. Ponsoldt*, 251 Kan. 88, Syl. ¶ 1, 833 P.2d 949 (1992). Only where there is a mutual mistake as to the contents and meaning of the contract is this rule inapplicable. *Rosenbaum*, 241 Kan. at 299. No mutual mistake is alleged in this case, only ignorance of the terms by Miner.

Even where a contracting party is unable to read, the party is under a duty to have a reliable person read and explain the contract to them before signing it. *Squires v. Woodbury*, 5 Kan. App. 2d 596, 599, 621 P.2d 443 (1980), *rev. denied* 229 Kan. 671 (1981). The "failure to obtain a reading and explanation of it [before signing] is such gross negligence as will estop him from avoiding it on the ground that he was ignorant of its contents." *Maltby v. Sumner*, 169 Kan. 417, Syl. ¶ 5, 219 P.2d 395 (1950). A party to the contract owes this duty to know and understand the contents of the contract before signing it "to the other party to the contract because the latter may and probably will pay his money and act in reliance upon the agreement." *Bailey*, 179 Kan. 169, Syl. ¶ 4. Enforcement of the rule holding the contracting party to the duty of knowing the contents of the contract before signing gives stability to written contracts and removes the temptation and possibility of perjury at a later date to vary the terms of the instrument. *Maltby*, 169 Kan. at 429.

Where insurance policies are not ambiguous, they are to "be enforced as written so long as the terms do not conflict with pertinent statutes or public policy." *House v. American Fam. Mut. Ins. Co.*, 251 Kan. 419, 427, 837 P.2d 391 (1992). A review of the PIP provisions of Farm Bureau's policy with Miner reveals it to be in compliance with the provisions of K.S.A. 1991 Supp. 40-3103 and K.S.A. 40-3110. The policy contains a comprehen-

sive, but clearly understandable, table of contents directing the insured to the PIP provisions of the policy. The policy pages describing the PIP benefits, including substitution services and rehabilitation expenses benefits, are clearly defined, with the procedure for obtaining any benefit covered set out in paragraph 2 under the payments section.

The policy clearly states Miner must supply written notice of a covered loss and the amount. Miner admitted at trial that she did not give written notice or supporting documentation to Farm Bureau of her claim for substitution benefits before or after the filing of this action. Furthermore, even after her attorney told her about the benefits, she did not submit a claim to Farm Bureau for them, nor did she direct her attorney to contact Farm Bureau as to the amounts to be reimbursed. Bob Miner also testified that, after their attorney informed them of the substitution and rehabilitation benefits, neither of them brought it to Farm Bureau's attention, prepared documentation concerning the accrual of the benefits, or sent anything to Farm Bureau pertaining to those benefits.

Both the statute and the insurance policy place the burden on the insured to give written notice and supporting documentation to the insurer before liability for payment accrues. K.S.A. 40-3110. Under K.S.A. 40-3110(a), no claim for PIP benefits may be made after two years from the date of injury. The record shows trial was held on April 23, 1991, almost two years and nine months after the date of injury, and Miner knowingly failed to prepare and submit written notice of her claim for substitution benefits. Such an omission is contrary to the statute and the policy provisions. Miner is barred from raising that issue at trial.

Miner argues Farm Bureau should have informed her of all covered losses and investigated the possibility of the substitution losses, citing *Dewey v. Allstate Ins. Co.*, 588 F. Supp. 479, 481 (1982), *aff'd* 739 F.2d 1494 (1984). This case is distinguishable from *Dewey*. In *Dewey*, the court was not considering the insurer's duty to investigate whether the claimant was entitled to different kinds of benefits under the policy. Instead, the court examined the denial of specific benefits after request by the insured, wherein notice and supporting documentation were supplied by the claimant, but the insurer, without investigating,

denied liability. Weighing heavily against the insurer in *Dewey* was the fact that, in denying liability of the claim, it refused to accept the claimant's proof of loss, would not say what it would accept, and sought no information on its own to verify or refute the claimed loss already submitted. 588 F. Supp. at 481-82. In this case, Miner never submitted a claim for substitution benefits which Farm Bureau would then have had a duty either to pay or investigate before denying.

It was error for the trial court to allow Miner to raise the issue of substitution benefits at trial.

The parties' arguments concerning rehabilitation benefits are essentially the same as the arguments on substitution benefits. In addition, Miner argues that, because some of the reports sent to Farm Bureau included references to a potential need for rehabilitation services, Farm Bureau had a duty to inform Miner of the benefit coverage. Again, Miner had a duty to know and understand the contents of the policy. The policy specifically states: "If the insured asks, we will obtain the services, therapy or training." Miner did not do so.

The record shows that at no time did Miner or her husband submit written notice or documentation that rehabilitation costs had been incurred, nor did they request Farm Bureau to procure such services for Miner. In fact, at the time of trial, two years and nine months after the accident, Miner still did not know what she wanted to do in terms of future employment and had not contacted Farm Bureau about the rehabilitation possibilities.

It was error for the trial court to allow the rehabilitation claim to go before the jury.

It is further noted that the effect of allowing the substitution and rehabilitation expense claims to go before the jury when no claim for those benefits had ever been filed and no cost incurred circumvents the statutory notice requirement and the two-year statute of limitations imposed under K.S.A. 40-3110 for initiating a claim for those benefits.

Farm Bureau claims numerous errors based on the trial court's instructions to the jury. On appeal,

"[n]o party may assign as error the giving or failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of

the objection, unless the instruction is clearly erroneous. K.S.A. 22-3414(3). Jury instructions are to be considered together and read as a whole, without isolating any one instruction. If the instructions properly and fairly state the law as applied to the facts in the case, and if the jury could not reasonably have been misled by them, then the instructions do not constitute reversible error although they may be in some small way erroneous. [Citation omitted.]" *Cerretti v. Flint Hills Rural Electric Co-op Ass'n*, 251 Kan. 347, 355, 837 P.2d 330 (1992).

"An instruction is clearly erroneous when the reviewing court reaches a firm conviction that, if the trial error had not occurred, there was a real possibility that the jury would have returned a different verdict." *Noon v. Smith*, 16 Kan. App. 2d 818, Syl. ¶ 2, 829 P.2d 922 (1992).

The trial court's jury instruction No. 3 read as follows:

"The plaintiff claims she has been denied personal injury protection benefits under her automobile insurance policy with the defendant.

"The plaintiff claims she is entitled to payment for lost earnings in an amount not to exceed $45,411.34.

"The plaintiff claims she is entitled to substitution benefits in an amount not to exceed $9,125.

"The plaintiff claims she is entitled to payment for rehabilitation benefits in an amount not to exceed $4,500.

"The plaintiff claims she is entitled to payment for additional medical expenses in the amount of $299.

"The plaintiff has the burden to prove her claims are more probably true than not true."

Farm Bureau objected to this instruction at trial because the claim for wage loss included amounts for time periods already submitted and paid and was is in excess of those amounts originally claimed. Farm Bureau further objected to the instruction because Miner did not submit any written notices claiming substitution and rehabilitation benefits. As already held herein, those issues were improperly brought before the jury and the instruction to the jury regarding those claims was clearly in error.

Farm Bureau also contends this instruction is based on inadmissible evidence contained in Miner's exhibit No. 33. Miner's exhibit No. 33 is not contained in the record on appeal. The contention is moot, however, in light of the clearly erroneous nature of the instruction.

The trial court's jury instruction No. 6 read as follows:

"The obligation of the insurance company is governed by the provisions of the policy.

"Words used in an insurance policy are to be read and understood in their ordinary and usual meaning.

"The terms of the insurance policy are susceptible of more than one meaning. Therefore, you must give the policy provisions that meaning which is most favorable to the policyholder."

Farm Bureau objected to this instruction at trial and argues here this instruction is erroneous because no evidence of ambiguity concerning the insurance contract was introduced at trial. We agree. The policy provisions are very clear and understandable. No issue was raised, nor was any evidence presented at trial, that there was an ambiguity in the policy provisions. It was the trial court's duty simply to instruct the jury to enforce the contract as written. See *Bell v. Patrons Mut. Ins. Ass'n*, 15 Kan. App. 2d 791, 794, 816 P.2d 407, *rev. denied* 249 Kan. 775 (1991). It was not a function of the trial court to create an ambiguity requiring an interpretation favorable to the insured when no ambiguity existed. *Bell*, 15 Kan. App. 2d at 794. By instructing the jury the policy provisions were ambiguous and to be interpreted in favor of Miner, the trial court prejudiced Farm Bureau and committed error.

Jury instruction No. 7 was given as follows:

"If you find the plaintiff has sustained injuries from the accident that made her unable to work for money in an available and appropriate job, you may award the following:
  a. Loss of earnings: $45,411.34
  b. Substitution Expenses: $9,125
  c. Rehabilitation Expenses: $4,500
  d. Medical Expenses: $299"

Farm Bureau objected to this instruction at trial as a misstatement of the law and the policy because it instructed the jury it could award substitution expenses, rehabilitation expenses, and medical expenses to Miner if it found she was unable to work in an appropriate and available job as a result of the accident. Under K.S.A. 1991 Supp. 40-3103(k), (r), and (w), such an instruction is clearly a misstatement of the law. It is also contrary to the accrual of those rights under the insurance policy. The instruction misdirects the jurors in their duty to consider whether valid substitution, rehabilitation, and medical benefits relating to

the accident were incurred. By misdirecting the jury to determine liability on a basis not set out by statute or the policy, the trial court prejudiced Farm Bureau.

The giving of this instruction was error not only for the reasons just stated, but also because the issues of substitution expenses, rehabilitation expenses, and underpayment of wage loss, which were included in the amount of wage loss listed in the instruction, were erroneously presented to the jury, as we have already held.

Jury instruction No. 8 read as follows: "If you find the plaintiff has, as a result of her accident, sustained the loss of monthly earnings due to her inability to work for money in an available and appropriate job, you may award her the amount of such loss not to exceed $45,411.34."

Farm Bureau objected to this instruction at trial because the amount of wage loss was incorrectly stated. This instruction is erroneous and prejudicial to Farm Bureau for the same reasons set out in our consideration of instruction No. 3.

The trial court's instruction No. 9 read as follows: "In order to recover personal injury protection benefits for loss of monthly earnings, the plaintiff must prove: 1. The lost earnings are due to her inability to engage in an available and appropriate job; and 2. This inability is the result of her injury."

At trial, Farm Bureau objected to this instruction because it did not read "gainful activity" as set out in K.S.A. 1991 Supp. 40-3103(b) and *Morgan v. State Farm Mut. Auto. Ins. Co.*, 5 Kan. App. 2d 135, 138-39, 613 P.2d 684 (1980). The instruction mirrors the language in Farm Bureau's policy with Miner. Although it does not use the term "gainful activity," the essence of the instruction is substantially consistent with the statute and the proof required under the policy. It was not error to give instruction No. 9.

Jury instruction No. 10 read:

"In determining the loss of monthly earnings for someone self-employed, you must look at what the person actually lost.

"The key to making this determination is to look at the value of the service performed in relation to the business. This is necessary because the value of the services are worth something and, therefore, are compensable.

"It appears possible for the business of a self-employed person to actually suffer a loss for the year and yet have the individual be entitled to benefits.

To calculate what was lost, you can determine what it would cost to hire someone to do the work the injured person performed.

"In determining the loss of monthly earnings, you should consider this case on the basis of what would be the replacement cost to hire another person to take the plaintiff's place and perform similar type of work."

At trial, Farm Bureau objected to this instruction, requesting the court to give the instruction Farm Bureau had submitted. Farm Bureau's proffered instruction is not in the record on appeal and cannot be considered. However, both Farm Bureau and Miner agreed the basis for the objection was that the instruction as given erroneously instructed the jury on how to calculate Miner's wage loss. *Dewey v. Allstate Ins. Co.*, 525 F. Supp. 857, 866 (1981), to which Farm Bureau refers, states: " 'To calculate what was lost, insurers can determine what it would cost to hire someone to do the work the injured person performed.' " The instruction given essentially states the same thing. Evidence was presented by Farm Bureau at trial that Miner's wage loss benefits were calculated on the cost of $5 per hour to hire Navinsky to replace Miner at the tavern. In light of the evidence at trial and the language in *Dewey*, the giving of the instruction was not error.

By instruction No. 11, the trial court instructed the jury in its consideration of substitution benefits, and instruction No. 12 pertained to the award for rehabilitation benefits. Because these benefits were improperly before the jury, as we have already held, the giving of these instructions was clearly erroneous and prejudicial to Farm Bureau.

As a final comment on the jury instructions given, it is noted that, because the amounts claimed for underpaid wage loss, substitution benefits, and rehabilitation benefits were improperly before the jury, the trial court's instruction No. 14 defining those terms was also in error.

Farm Bureau contends that, under K.S.A. 40-3110(b) and *Coe v. Security National Ins. Co.*, 228 Kan. 624, 630, 620 P.2d 1108 (1980), it is not liable for interest payments unless it has refused to pay a claim without good cause. Farm Bureau argues that no interest payments were due on the amounts claimed for rehabilitation expenses, substitution expenses, and underpayment of wage loss amounts because no claims were submitted for those

amounts thereby making them due and payable. Farm Bureau further contends that no interest is due for wage loss benefits not paid after the termination of that benefit because it relied on the reports of several doctors in concluding Miner was no longer entitled to those benefits.

Miner argues interest is appropriate because Farm Bureau made no attempt to alert her to the possibility of substitution and rehabilitation expense benefits and failed to investigate the issue of appropriate or available activity for Miner or to determine the true facts of the controversy. Furthermore, Miner asserts that, because the trial court treated the filing of the petition as a written demand for all the benefits asserted in the petition, interest should be awarded from that date. Miner also contends that, because several bills were presented to Farm Bureau for payments which were overdue, interest was appropriate.

This court has recognized that the award of interest is "a matter of judicial discretion subject to being overruled only when there is an abuse of discretion." *Crawford v. Prudential Ins. Co. of America*, 245 Kan. 724, 737, 783 P.2d 900 (1989).

Under K.S.A. 40-3110(b), "the insurer becomes liable for payment of PIP benefits once the insured has provided 'reasonable proof' of the loss itself and the amount of the loss." *DiBassie v. American Standard Ins. Co. of Wisconsin*, 8 Kan. App. 2d 515, 518, 661 P.2d 812 (1983).

In granting statutory interest to Miner, the trial court stated:

"In our particular case, of course, like the *DiBassie* case, there was no need of reasonable proof of the right of the plaintiff to recover the benefits *since the insurance company had paid some benefits*. However, the Court finds the insurance company was unreasonable in stopping the payment of benefits when they did." (Emphasis added.)

The trial court also found that, at the time the wage loss benefits were cut off, Miner had filed requests for wage loss and rehabilitation services up to the date the petition was filed. The trial court then held that Farm Bureau did not investigate the circumstances enough and ordered interest against Farm Bureau from April 2, 1990, 25 days before the action was filed.

*DiBassie*, upon which the trial court and Miner rely, is distinguishable from the case at hand. In *DiBassie*, the insured had furnished written notice of the injury and benefit claimed, along

with an itemized bill for medical treatments from the University of Kansas Medical Center. The insurer refused to pay, even though it had received the police accident report, an itemized hospital bill detailing treatment received and clearly coinciding with the date of the accident, and a signed consent form for release of claimant's medical records. Thus, the court found the claimant had supplied reasonable proof requiring the insurer to pay the benefits. The notice sent by the claimant, on its face, did not create a good faith controversy whereby the insurer would be relieved of payment. 8 Kan. App. 2d at 521-22.

Likewise in *Dewey*, 588 F. Supp. at 481-82, the insurer continually refused to make payment after the claimant had sent in reasonable proof with supporting documentation. The insurer, once receiving reasonable proof of loss, refused to inform the claimant why his affidavit was inadequate or what additional facts were required. Thus, the insurer was held not to have investigated the facts before denying the benefits.

In the instant case, no demand or reasonable proof of loss concerning substitution expenses, rehabilitation expenses, or underpayment of wage loss benefits for times already submitted and paid was ever furnished to Farm Bureau prior to filing the lawsuit, or even before trial. Since no demand was ever made regarding those expenses, Farm Bureau was not liable for those amounts, and they were improperly brought before the jury. Because no demand was made, no liability for payment accrued as to those benefits, and the statutory provision of K.S.A. 40-3110(b) authorizing interest was never triggered.

Where reasonable proof of loss is sent,

"no benefits shall be deemed overdue where the insurer or self-insurer has reasonable proof to establish that it is not responsible for payment of those particular benefits, or when in the sound discretion of the trial court the circumstances confronting the insurer when the claim for benefits was denied furnished just cause or excuse for refusal to pay such claim." *Coe*, 228 Kan. at 632.

The question then is whether Farm Bureau had just cause, based on reasonable proof, to terminate the wage loss benefits and refuse to pay disputed medical benefits.

Farm Bureau, relying on the reports of Drs. Kelly, Maeda, Shriwise, Eplee, and Reddy, terminated any further payments of

wage loss to Miner in 1990. A review of the documents presented at trial reveals: On October 31, 1989, Dr. Shriwise informed Farm Bureau that Miner should remain off work until further evaluation by Dr. Maeda. On November 20, 1989, Dr. Maeda, while stating he did not have much to offer Miner in the way of conservative management of her problem, urged her to settle with the insurance company and get on with her life, but he did not expressly state she had no work restrictions or disabilities. On February 27, 1990, Dr. Shriwise informed Farm Bureau that work modification might be a reasonable alternative for Miner. A report by Dr. Shriwise on January 25, 1990, had indicated that Miner could not go back to her previous job, which required the lifting of heavy objects and bending, but that she could do some jobs with restrictions. Finally, on March 1, 1990, Dr. Eplee informed Farm Bureau that Miner was still under a "significant disability situation."

After the filing of the petition herein, Farm Bureau was furnished with various reports indicating Miner was not released to go to work, that Miner was 50% disabled with employment possibilities being nil, that the mainstay of her treatment was physical activity and exercises in spite of pain, that it was obvious Miner was not gainfully employable, that no restrictions should be placed on Miner's activities and a gradual increase in physical activity and a return to a normal lifestyle was recommended, and that Miner was placed on lifting restrictions because of her inability to return to her normal work.

Were it only that the facts on the record indicate there were conflicting and inconclusive recommendations respecting Miner's work status at the time of termination, it is not probable we could find the trial court abused its discretion in assessing statutory interest against Farm Bureau for benefits overdue. Of course, the statutory interest would apply only to those amounts which were overdue and which were properly raised and brought to the jury. Because no claim for substitution expenses, rehabilitation expenses, and underpayment of wage loss was ever submitted to Farm Bureau, those amounts were improperly brought before the jury, never became due, and are not subject to statutory interest. Furthermore, the jury did not find Farm Bureau liable for any medical expenses owing to Miner. When we con-

sider all the erroneous bases upon which the trial court entered judgment and against which interest was assessed, we can only conclude the trial court did abuse its discretion in assessing statutory interest against Farm Bureau, and we set aside that assessment.

Two medical expenses not paid were a bill to the Mayo Clinic and an allegedly prescribed mattress. Evidence at trial showed Farm Bureau had reasonable proof for disputing the payment of the Mayo Clinic bill because Farm Bureau paid it, only to receive a rebate from the clinic because the bill had already been paid. Even at the time of trial, Farm Bureau had not received any evidence of who had paid the bill so it could reimburse the appropriate person or entity. As for the cost of the mattress, Miner claimed Dr. Eplee prescribed the mattress, but Dr. Eplee denied prescribing it.

The trial court granted Miner's post-trial motion for future medical expenses. The issue of future medical benefits was not raised at trial or in Miner's petition. The controversy, in essence, is whether, after the passing of the two-year statute of limitations under K.S.A. 40-3110(a), Miner can claim additional medical benefits resulting from the injury for ongoing treatment until the policy limits are reached. Although it was not raised as an issue at trial, the trial court later found Miner was entitled to payment for medical expenses up to the policy limit if she furnished the required documentation showing it was continuing medical treatment expenses that were a result of the accident.

By requiring Miner to furnish Farm Bureau with documentation that the medical expenses were continuing medical treatment resulting from the accident, the requirement of specificity under *Bradley v. AID Insurance Co.*, 6 Kan. App. 2d 367, 629 P.2d 720, *rev. denied* 230 Kan. 817 (1981), is met. Since Miner had furnished Farm Bureau with required notice and documentation of medical expenses before litigation and Farm Bureau had been paying for medical treatment, it was not error to require Farm Bureau to continue paying for necessary medical treatment until the policy limits have been reached.

K.S.A. 40-3111(b) provides for the recovery of attorney fees against the insurer or self-insurer when "the court finds that the insurer or self-insurer unreasonably refused to pay the claim or

unreasonably delayed in making proper payment." When construing K.S.A. 40-3111(b), the court may look to the cases construing K.S.A. 40-256 wherein a claimant may recover attorney fees if the refusal to pay was without just cause or excuse. *DiBassie*, 8 Kan. App. 2d 515, Syl. ¶ 6.

"The question of whether an insurer has refused to pay without just cause or excuse is one of fact for the trial court. *Farm Bureau Mutual Ins. Co. v. Carr*, 215 Kan. 591, 598, 528 P.2d 134 (1974). In refusing to pay a claim, an insurance company has a duty to make a good faith investigation of the facts surrounding the claim. *Brown v. Combined Ins. Co. of America*, 226 Kan. 223, 227, 597 P.2d 1080 (1979). If there is a bona fide and reasonable factual ground for contesting the insured's claim, there is no failure to pay without just cause or excuse. *Koch, Administratrix v. Prudential Ins. Co.*, 205 Kan. 561, 565, 470 P.2d 756 (1970). Whether an insurance company's refusal to pay is without just cause or excuse is determined on the facts and circumstances in each case. *Smith v. Blackwell*, 14 Kan. App. 2d 158, 165, 791 P.2d 1343 (1989), *rev. denied* 246 Kan. 769 (1990).

"Whether there was just cause to refuse payment and, therefore, justification for denial of attorney fees is in the trial court's sound discretion. *DiBassie v. American Standard Ins. Co. of Wisconsin*, 8 Kan. App. 2d 515, Syl. ¶ 8, 661 P.2d 812 (1983). Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable person would take the view adopted by the trial court. *Stayton v. Stayton*, 211 Kan. 560, 562, 506 P.2d 1172 (1973)." *Evans v. Provident Life & Accident Ins. Co.*, 249 Kan. 248, 261-62, 815 P.2d 550 (1991).

The trial court, in its decision, assessed attorney fees against Farm Bureau because

"[e]xcept for medical, it appears according to the evidence that the claims have not always been paid when requested by the plaintiff. By this, the Court means the defendant did not take the initiative to comply with the terms of the policy when, in fact, it had been paying the loss of earnings (wages) under PIP for some time after the accident."

This holding apparently encompasses the claims for wage loss benefits as to underpayment and unpaid substitution expenses and rehabilitation benefits of which the trial court held Farm Bureau had the required notice when this action was filed. As previously held, however, the filing of the petition was not proper notice as required by statute or the insurance policy and did not trigger Farm Bureau's liability to pay Miner's claims for underpayment of wage loss, substitution expenses, or rehabilitation expenses. Thus, the trial court's reliance on the fact Farm Bureau

did not pay the benefits claimed, despite the fact Miner never sent Farm Bureau any documentation of the amounts claimed for each benefit, is erroneous.

Furthermore, future medical expenses were not addressed at trial and had not been incurred at that time. Farm Bureau cannot be said to have refused to pay them and cannot be assessed attorney fees for not having paid them.

The only real basis upon which the trial court could decide if attorney fees were appropriate was to consider whether Farm Bureau's decision to terminate the wage loss benefit and refuse payment after that date was reasonable and based on just cause or excuse.

As previously discussed, the evidence at trial brought out that, at the time of Farm Bureau's decision to terminate wage loss payments, the doctors treating Miner issued conflicting reports concerning Miner's ability or inability to work prior to the filing of this action. After the filing of the petition, Farm Bureau had notice of the possibility of Miner's continued disability. However, documentation was not sent itemizing the amounts claimed for lost wages during that period.

At the time the trial court was considering the matter of attorney fees, it also improperly had before it the jury award for underpayment of wages, substitution expenses, and rehabilitation expenses.

In conjunction with this issue, Farm Bureau argues that the trial court improperly assessed various litigation expenses of Miner against Farm Bureau as attorney fees. Farm Bureau asserts that neither K.S.A. 40-256 nor K.S.A. 40-3111(b) makes any provision for allowing recovery of Miner's litigation expenses.

Costs and expenses do not ordinarily include attorney fees. The allowance of attorney fees is dependent upon express statutory authority. *Wolf v. Mutual Benefit Health & Accident Association*, 188 Kan. 694, 700, 366 P.2d 219 (1961).

K.S.A. 40-3111(b) expressly allows a claimant to recover attorney fees from an insurer. No mention is made of costs or expenses of litigation in granting recovery of attorney fees. However, when that same subsection addresses the insurer or self-insurer's ability to recover attorney fees when defending an insured person in litigation, it expressly states the insurer or self-insurer may be

allowed reasonable attorney fees "based upon actual time expended, and all reasonable costs of suit for its defense."

" '[I]t is presumed the legislature understood the meaning of the words it used and intended to use them; that the legislature used the words in their ordinary and common meaning; and that the legislature intended a different meaning when it used different language in the same connection in different parts of a statute.' [Citation omitted.]" *Boatright v. Kansas Racing Comm'n,* 251 Kan. 240, 245-46, 834 P.2d 368 (1992).

The mention of costs incurred in defense of litigation being allowable to the insurer, while excluding that provision in the paragraph pertaining to the insured's right to recover attorney fees, evidences an intent on the part of the legislature to exclude the recovery of litigation costs from the assessment of attorney fees for the insured. See *State v. Luginbill,* 223 Kan. 15, 20, 574 P.2d 140 (1977) (during statutory interpretation, the inclusion of one thing implies the exclusion of the other).

The recovery of attorney fees is expressly governed by statute; therefore, the trial court was without authority to include the litigation costs in the attorney fee recovery and Farm Bureau's failure to object at trial is inconsequential. It was error for the trial court to include litigation costs in the attorney fees allowance.

When we consider the totality of the circumstances and the several erroneous bases upon which the attorney fees were addressed, we can only conclude the trial court abused its discretion in assessing Miner's attorney fees against Farm Bureau, and we set aside that assessment.

This case is reversed and remanded for a new trial on the correct amount to be assessed against the insurance company for the periods of nonpayment of wages. The judgment awarded for substitution expenses, rehabilitation expenses, and underpayment of wage loss for time periods already paid is reversed and the case is remanded with direction to enter a directed verdict for Farm Bureau on those issues. The award of statutory interest and attorney fees is reversed. The judgment entered for future medical expenses is affirmed.