(913 P.2d 1231)
Nos. 73,063
73,686

TOMMY RAY RIDGWAY, *Appellant*, v. SHELTER INSURANCE COMPANIES, *Appellee*.

Opinion filed April 5, 1996.

*Patrick C. Smith*, of Spigarelli, McLane & Short, of Pittsburg, for appellant.

*Mark E. Fern*, of Fern & Angermayer, L.L.C., of Pittsburg, for appellee.

Before BRAZIL, C.J., MARQUARDT, J., and RICHARD M. SMITH, District Judge, assigned.

BRAZIL, C.J.: Tommy Ridgway appeals two cases involving his coverage under a motorcycle insurance policy issued by Shelter Insurance Company (Shelter). We affirm.

The cases arose out of an accident in which Ridgway was struck by a car while on his motorcycle. Ridgway suffered personal injury and property damage, but the driver of the car that struck him was uninsured. Ridgway sued Shelter in one of the cases for failure to pay personal injury protection (PIP) benefits under his motorcycle insurance policy. In the other case, Ridgway sued Shelter, the driver of the car which struck him, and the driver of another vehicle involved in the accident, alleging negligence by the two drivers and alleging uninsured/underinsured motorist (UM) coverage under the motorcycle insurance policy. Shelter defended in each case on

the ground that Ridgway, through his agent Billie Lewis, had rejected in writing the coverages he sought to recover; the trial court granted Shelter summary judgment in each case.

On appeal, Ridgway asserts the following reasons why the trial court erred in finding valid rejections of the PIP and UM coverages: (1) the pertinent Kansas insurance code statutes do not permit an agent of the named insured to reject the coverages at issue; (2) if the statutes do permit an agent to reject the coverages at issue, either (a) Lewis lacked authority from Ridgway to effect the rejections or (b) Lewis' rejections were ineffective under common-law waiver principles.

At the time of the accident, Ridgway had been living with his girlfriend, Billie Lewis, for almost 5 years, and the two had a daughter together. The three lived in a house owned by Lewis.

Approximately a year before the accident, Ridgway acquired a motorcycle and instructed Lewis to get insurance on the motorcycle for him. Lewis went to Shelter for the insurance because Ridgway told her to get the insurance at the same place that insured his car. According to Lewis, Ridgway told her to get liability insurance but said nothing to her about policy limits. Ridgway stated he "[j]ust told her to get insurance, go by and get me some insurance on the motorcycle so I could ride it." In addition, Ridgway was questioned at his deposition:

"Q. [By Shelter's counsel] Did you tell her anything specifically about getting insurance when she went?

"A. No, just to purchase insurance.

"Q. Did you tell her whether to get comprehensive, where everything is covered, or liability only or anything like that?

"A. I figured, you know, she would just get liability because I didn't even know if they would cover a motorcycle that old, a 77. Because I had a car or something before, and it seems like they told me I couldn't get insurance when it was so old, full coverage insurance or something.

"Q. Did you talk to Billie about that at all before she went over?

"A. No. I just told her to get it and she was going to get it."

Ridgway further stated he gave Lewis money to get the insurance.

Lewis went to Shelter and negotiated a policy with Chuck Sirratt. Sirratt stated he originally knew Lewis from having written insurance for her on another policy, then came to know Ridgway

through Lewis, and then wrote another insurance policy for Ridgway as well. Sirratt stated that Lewis handled most of Ridgway's insurance needs, including the signing of documents.

Lewis stated that when she went to see Sirratt about the motorcycle insurance, she signed Ridgway's signature to two "waivers" but did not read the waivers or know what they were:

"Q. [By Shelter's counsel] And did Chuck have you sign anything when you were there?

"A. Now, when this accident happened, yes, I remember signing this paper, a waiver, but I don't know what it is. I signed more than just that. I signed two pieces of paper, I paid him, and then I left.

. . . .

"Q. Do you remember signing Tommy's signature to two documents at the insurance agency that day?

"A. Yes.

"Q. Did you try to call Tommy to talk to him about the things you were signing?

"A. No.

"Q. Did they tell you what they were at the agency, the things you were signing?

"A. Not that I recall. I just thought it was insurance.

"Q. Did you read the things you signed?

"A. No.

"Q. Would that be a common practice for you to sign your name or somebody else's name to something you wouldn't have read?

"A. Yes."

The policy which Lewis procured for Ridgway listed coverage for bodily injury as $50,000 per person, $100,000 per accident, with $25,000 property damage coverage (50/100/25). The policy listed UM coverage as $25,000 per person and $50,000 per accident (25/50). Attached to the application form is a "NOTICE OF REJECTION OF PERSONAL INJURY PROTECTION BENEFITS," which Lewis admitted signing, bearing Ridgway's name. Lewis also signed, in Ridgway's name, a "REDUCED LIMITS ELECTION" rejecting UM coverage equal to the limits of bodily injury liability coverage on the policy and instead selecting a UM coverage limit of $25,000 per person and $50,000 per accident.

Lewis stated that, after she procured the insurance, she and Ridgway never discussed the insurance in detail or what the policy

covered. On checks drawn on her account, Lewis later paid renewal premiums on the policy in November 1991, February 1992, and June 1992.

At issue are two provisions of the Kansas insurance code, K.S.A. 40-101 *et seq.* Under K.S.A. 40-3107(f), every motor vehicle liability insurance policy issued to a Kansas insured shall

"include personal injury protection benefits to the named insured, relatives residing in the same household, persons operating the insured motor vehicle, passengers in such motor vehicle and other persons struck by such motor vehicle and suffering bodily injury while not an occupant of a motor vehicle, not exceeding the limits prescribed for each of such benefits, for loss sustained by any such person as a result of injury. *The owner of a motorcycle*, as defined by K.S.A. 8-1438 and amendments thereto or motor-driven cycle, defined by K.S.A. 8-1439 and amendments thereto, *who is the named insured, shall have the right to reject in writing insurance coverage including such benefits for injury to a person which occurs while the named insured is operating or is a passenger on such motorcycle or motor-driven cycle*; and unless the named insured requests such coverage in writing, such coverage need not be provided in or supplemental to a renewal policy when the named insured has rejected the coverage in connection with a policy previously issued by the same insurer. The fact that the insured has rejected such coverage shall not cause such motorcycle .or motor-driven cycle to be an uninsured motor vehicle." (Emphasis added.)

In addition, K.S.A. 40-284(c) provides: "The insured named in the policy shall have the right to reject, in writing, the uninsured motorist coverage required by subsections (a) and (b) which is in excess of the limits for bodily injury or death set forth in K.S.A. 40-3107 and amendments thereto."

Ridgway contends that the written rejections signed by Lewis in this case are ineffective under the above statutes because they were signed by someone other than the named insured. Shelter contends the trial court correctly found the relevant statutes contain no language which undermines the application of common-law agency principles to determine whether valid rejections occurred in this case.

Although this appeal is from an entry of summary judgment, this issue is purely one of statutory interpretation, which is a question of law. As to this issue, therefore, this court's review of the trial

court's decision is unlimited. See *State v. Donlay*, 253 Kan. 132, 133-34, 853 P.2d 680 (1993).

.. Ridgway argues that this issue is controlled by *Larson v. Bath*, 15 Kan. App. 2d 42, 801 P.2d 1331 (1990), *rev. denied* 248 Kan. 996 (1991). He argues that *Larson* requires rejection of PIP benefits and of the higher UM limits by the named insured only. He cites particularly the *Larson* court's emphasis in its holding upon rejection by the *named insured* and also the requirement of a narrow and strict construction of the rejection provisions of K.S.A. 40-284(c), which arguably would apply equally to the rejection provisions of K.S.A. 40-3107(f). Shelter argues that *Larson* is factually distinguishable because in *Larson* no rejection was ever signed or attached to the policy. Shelter also argues that the inference from *Larson* is that, had the rejection been properly signed by the employer's agent who procured the insurance, the rejection would have been effective.

*Larson* is not controlling in the present case. *Larson* did not address the pivotal issue here of whether the insurance code permits an authorized agent of the insured to reject the respective coverage provisions in K.S.A. 40-284(c) and K.S.A. 40-3107(f).

There is a sizable body of case law, however, involving the procurement of insurance for an insured by an insured's agent. See 3 Couch on Insurance 3d § 44:1-37 (1995). Although there are no Kansas cases on point, a similar situation arose in *Soileau v. Hartford Accident & Indemnity Co.*, 182 So. 2d 76 (La. App. 1966). In *Soileau*, a husband sought to recover UM benefits under an automobile liability policy. The Louisiana statute involved required auto liability insurers to provide uninsured motorist coverage "unless 'any insured named in the policy shall reject the coverage.' " 182 So. 2d 76. In suing his insurer, the husband alleged that the policy issued to him improperly omitted the mandatory UM coverage because he, as the insured named in the policy, had not rejected the coverage. The trial court had found the wife was authorized by the husband to reject the UM coverage, and the husband appealed.

The court found that, under the general rule in American jurisprudence, a husband was bound by the coverage procured by his

wife when she was acting as his validly authorized agent. The court further found that the wife in *Soileau* had actual authority to procure the insurance, and thus the statutory requirement that "the insured named in the policy" shall reject the coverage had not been violated. 182 So. 2d at 77. Notably, *Soileau* arose out of the same jurisdiction as *Roger v. Estate of Moulton*, 513 So. 2d 1126 (La. 1987), cited by Ridgway for support in his brief. In that case, a letter from the insured purporting to expressly reject uninsured motorist coverage was never physically attached to the original policy or subsequent renewals and could not operate as a valid rejection. *Estate of Moulton* is distinguished by different facts.

Although the present case does not involve a husband-wife relationship, the same principles of agency are involved. *Soileau* provides authority for Shelter's proposition that, although the legislature provided in the insurance code for the rejection of PIP and UM benefits by the named insured, it does not necessarily follow that the legislature intended to abrogate the principles of agency law. Absent a more express statement by the legislature, we find that the Kansas insurance code permits a named insured to give a legal agent the authority to reject the respective coverage provisions in K.S.A. 40-284(c) and K.S.A. 40-3107(f).

Shelter contends the trial court correctly found that Lewis had authority as Ridgway's agent to effect the coverage rejections found in K.S.A. 40-284(c) and 40-3107(f). Ridgway does not address this issue at any length in his brief. Ridgway devotes two sentences to this issue, without any supporting legal authority:

"Although it is agreed that Tommy Ridgway authorized Billie Lewis to procure insurance for him, it is uncontroverted that Tommy Ridgway did not authorize her to reject any statutorily required coverage. She was authorized to purchase insurance only."

There is no question here that Ridgway expressly authorized Lewis to procure motorcycle insurance for him. The only argument suggested by Ridgway is that, in rejecting PIP coverage and higher UM coverage, Lewis exceeded Ridgeway's express grant of authority.

Even if we were to find that Lewis did not have express authority to reject the PIP coverage and higher UM coverage, Lewis certainly had implied authority in this case. In instructing Lewis to procure insurance for him, Ridgway placed no limitations or restrictions upon her. He deferred the coverage specifics to Lewis, just as he had deferred the handling of other household financial matters to her. " ' "On the question of implied agency, it is the manifestation of the alleged principal and agent as between themselves that is decisive, and not the appearance to a third party or what the third party should have known." ' " *Mohr v. State Bank of Stanley,* 241 Kan. 42, 46, 734 P.2d 1071 (1987) (quoting 2A C.J.S., Agency § 52, p. 627). The decision whether to reject the coverages arose as a necessary or reasonable implication in order for Lewis to effectuate Ridgway's express instruction to procure insurance. See 3 Am. Jur. 2d, Agency § 75, p. 579.

There is no genuine issue as to any material fact concerning the agency relationship. See *Mitzner v. State Dept. of SRS,* 257 Kan. 258, 260-61, 891 P.2d 435 (1995). The trial court did not err in finding Lewis had authority as Ridgway's agent to reject PIP benefit coverage or elect reduced UM coverage.

Next, Ridgway contends the rejections by Lewis should be considered ineffective because Lewis did not knowingly or intentionally reject the statutorily mandated coverages. Shelter contends that Kansas contractual law presumes that, in signing the documents, Lewis understood the ramifications of the rejections and intended to reject the coverages.

In one of the cases cited by Ridgway, this court stated that waiver in contract law "is consensual in nature, and the intention may be inferred from conduct, and the knowledge may be actual or constructive." *Stratmann v. Stratmann,* 6 Kan. App. 2d 403, 410-11, 628 P.2d 1080 (1981). Shelter argues that, by signing the rejection forms, Lewis had constructive knowledge of the coverage she was rejecting and demonstrated her intent to reject the coverages. Shelter cites *Miner v. Farm Bur. Mut. Ins. Co., Inc.,* 17 Kan. App. 2d 598, 609, 841 P.2d 1093 (1992), *rev. denied* 252 Kan. 1092 (1993), where this court stated:

"Kansas has long held it to be 'the duty of every contracting party to learn and know the contents of a contract before he signs and delivers it.' *Bailey v. Talbert*, 179 Kan. 169, Syl. ¶ 4, 294 P.2d 220 (1956). 'As a result of this duty, a person who signs a written contract is bound by its terms regardless of his or her failure to read and understand its terms.' *Rosenbaum v. Texas Energies, Inc.*, 241 Kan. 295, 299, 736 P.2d 888 (1987). See *Vanier v. Ponsoldt*, 251 Kan. 88, Syl. ¶ 1, 833 P.2d 949 (1992). Only where there is a mutual mistake as to the contents and meaning of the contract is this rule inapplicable."

The rejection-of-coverage forms signed by Lewis are unambiguous. As such, they should " 'be enforced as written so long as the terms do not conflict with pertinent statutes or public policy.' " 17 Kan. App. 2d at 609. Ridgway's suggestion that Lewis did not understand the nature of the forms she was signing, even if true, is unavailing. Neither K.S.A. 40-284(c) nor K.S.A. 40-3107(f) mandates the duty to inform suggested by Ridgway. Also, Ridgway has provided no legal support for a public policy in favor of a duty to inform in this instance. On the other hand, as stated in *Miner*, "[e]nforcement of the rule holding the contracting party to the duty of knowing the contents of the contract before signing gives stability to written contracts and removes the temptation and possibility of perjury at a later date to vary the terms of the instrument." 17 Kan. App. 2d at 609.

Ridgway also argues in his brief that Sirratt did not understand the meaning of PIP or UM coverage and, therefore, Lewis' rejection was unknowing. However, in his own recitation of the facts, Ridgway states that Sirratt did not discuss with Lewis the meaning of PIP or UM coverage. Thus, even if Sirratt misunderstands the meaning of those coverages, his misunderstandings would not have influenced Lewis. Under Kansas contract law, Lewis had the duty to ask questions about the meanings of the various coverages if she did not understand them. The undisputed facts here show that Lewis had the opportunity to ask any questions about the coverages but declined to do so. Lewis' rejections of the coverages were valid.

Affirmed.